45 A.3d 310

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
REYNALDO GALICIA, DEFENDANT–APPELLANT.

Argued November 30, 2011—Decided June 19, 2012.

Albin, J., filed a dissenting opinion.

———

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Frank J. Ducoat,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney).

Justice PATTERSON delivered the opinion of the Court.

On May 2, 2004, an argument on a Newark street escalated into an altercation that caused the death of a young man. Julio Colon, a Vineland resident who had recently moved to Newark, was approached by two men with whom he had previously been

romantically involved, Hector Cordero and defendant Reynaldo Galicia. Cordero and defendant had traveled from Vineland to Newark to confront Colon about a sport utility vehicle (SUV) that he had borrowed but failed to return. Cordero implored Colon to renew their relationship, and Cordero and defendant both begged Colon to return to Vineland with them.

Their quarrel swiftly turned violent. The three men battled over the keys to the SUV, and Colon exchanged punches and kicks with Cordero and defendant. With Cordero in the passenger seat, defendant twice drove his car toward Colon, prompting Colon to climb on the hood of the car and bang his fists on the window. As Colon clung to the car, defendant accelerated and drove several blocks, running a stop sign. Defendant abruptly stopped the car, and Colon fell from the hood to the pavement. He sustained severe head injuries and died a week later.

Tried separately from Cordero, defendant was convicted by a jury of aggravated manslaughter, second-degree aggravated assault, disorderly persons theft and weapons charges. His conviction and sentence were affirmed by the Appellate Division. This Court granted defendant's petition for certification.

This appeal requires us to consider the "passion/provocation" statute, *N.J.S.A.* 2C:11–4(b)(2). The statute reduces what would otherwise be murder to voluntary manslaughter when "[a] homicide which would otherwise be murder under section 2C:11–3 is committed in the heat of passion resulting from a reasonable provocation." *N.J.S.A.* 2C:11–4(b)(2). We decline defendant's invitation to reconsider our holding in *State v. Grunow,* 102 *N.J.* 133, 506 *A.*2d 708 (1986). There, we rejected the defendant's contention that the Legislature intended *N.J.S.A.* 2C:11–4(b)(2) to mitigate aggravated manslaughter to voluntary manslaughter. We further reject defendant's argument that *N.J.S.A.* 2C:11–4(b)(2) is unconstitutional insofar as it may mitigate murder, other than felony murder, but not manslaughter. The Legislature did not violate equal protection principles when it enacted *N.J.S.A.* 2C:11–4(b)(2), which authorizes passion/provocation to affect only

one form of criminal homicide—murder committed in violation of *N.J.S.A.* 2C:11–3. We affirm the Appellate Division's determination on those issues.

We hold that the facts of this case, as developed in the trial record, do not support a passion/provocation finding under *N.J.S.A.* 2C:11–4(b)(2). When defendant drove his vehicle directly at Colon—forcing the victim to cling to the windshield wiper—and then jarred him from the hood to the pavement with abrupt braking and acceleration, he was not in a fury provoked by emotion or a violent attack. Instead, in the words of his counsel, he was "nervous, panicked and confused." No argument of counsel or testimony of trial witnesses suggested that defendant acted in the heat of passion resulting from a reasonable provocation when the victim sustained his fatal injury. Although the prosecution requested, and the court gave, a jury charge regarding the statute, it was recognized by both the prosecution and the defense to be inapplicable in the factual setting of this case.

We further hold that the verdict sheet incorrectly guided the jury in its consideration of the passion/provocation issue, and reverse that portion of the Appellate Division's decision that deemed the verdict sheet not to constitute error. Notwithstanding the trial court's correct instruction to the jury that it could not find defendant guilty of murder unless it concluded that passion/provocation did not apply, the verdict sheet improperly directed the jury not to consider the issue of passion/provocation unless it had already reached a guilty verdict on the murder charge. We remind trial judges of the importance of ensuring that verdict sheets are consistent with the jury charges and the legal standard. However, given the absence of an evidentiary foundation for an application of *N.J.S.A.* 2C:11–4(b)(2), the trial court's error was harmless.

Finally, we affirm the Appellate Division's decision rejecting defendant's belated invocation of the use of force in self-defense as a defense to the charges against him. Behind the wheel and in control of a locked car, defendant faced no imminent threat from

Colon, who was attempting to cling to a moving vehicle as he banged on the windshield. The trial court's omission of self-defense from the jury charge did not give rise to plain error, and we accordingly affirm the decision of the Appellate Division with respect to this issue.

I.

The incident at the center of this case occurred in the setting of a series of romantic relationships. Colon and Cordero lived together for a substantial period until December 2002, when they separated. Cordero persistently sought a reconciliation, but after meeting defendant through the internet, Colon moved in with him in Vineland in about February 2004. Colon also initiated an online friendship with Irwin Castro, who lived with his roommate Edward James in an apartment in Newark. Colon visited Castro during the weeks preceding his death. Castro and James agreed that Colon could stay with them in Newark while he sought employment in New York City, and it was agreed that he would move in with them over the last weekend in April 2004.

On Friday, April 30, 2004, Colon borrowed a Chevrolet Suburban SUV belonging to his former employer, Kenneth Sheppard, assuring Sheppard that he needed the SUV to move personal belongings and would shortly return it. The next day, advising defendant that he was leaving to get a haircut and visit his mother, Colon drove to Newark. Defendant, unable to reach Colon despite repeated attempts, called Cordero on the evening of May 1, 2004, notwithstanding the fact that they had never met, and the two spent the evening and part of the next day discussing the situation. On Sunday, May 2, 2004, defendant and Cordero approached Colon's former employer, Sheppard, and learned that Colon had borrowed Sheppard's SUV and had failed to return it. They offered to drive to Newark and retrieve the SUV. Sheppard agreed, but did not direct them to take the SUV by force.

Defendant and Cordero drove to Newark in defendant's Acura, and knocked on the door of the apartment shared by James and

Castro, where they knew Colon would be staying. Told by James that they had located the wrong apartment, defendant and Cordero called Colon's name from the street. In an attempt to avoid disturbing the neighbors, James went outside and spoke with defendant and Cordero, who told him that they were in Newark to collect Sheppard's SUV, which was considered stolen. Attempting to defuse the situation, James instructed Colon to contact the SUV's owner and reassure him that the SUV would be returned. Colon complied.

Undeterred, defendant and Cordero located the borrowed SUV, parked and unlocked on East Delavan Avenue around the corner from the apartment of James and Castro. They entered the SUV, took items belonging to Colon, and brought them to defendant's car. Shortly thereafter, they encountered Colon, James and Castro, who approached the SUV intending to move it to a safer location. Colon and Cordero began to argue over the keys to the SUV. According to defendant, Cordero begged Colon to "come home" and resume their relationship. According to the trial testimony of James, who witnessed most of the incident, Colon pulled Cordero out of the SUV, telling Cordero and defendant to go home to Vineland.

The situation escalated immediately. James testified that defendant left his car to join in the struggle, hit Colon from behind, and "got popped in the face" by Colon. Defendant, in contrast, characterized Colon as the initial aggressor, and testified that Colon kicked and punched him, and put him in a headlock when he tried to intervene in the altercation between Cordero and Colon.

Stating that he intended to go home, defendant returned to his Acura. James recalled that after grabbing the SUV keys from Colon, Cordero entered the Acura and sat in the passenger seat, directing defendant to start the car. With the doors locked, defendant drove the Acura toward Colon, who was running toward the car. James testified that he yelled to warn Colon that the car would hit him, and that Colon leaped on the hood to avoid being struck by defendant's car. A neighbor who witnessed part of the

incident confirmed that Colon followed Cordero toward defendant's car, but testified that Colon climbed on the hood of the car and sat with his back against the windshield. According to defendant's account, Colon was "breaking the windshield." He testified, "I didn't know what to do. I panicked. I'm shocked. I just left," and he did so, with Colon on the hood of his car.

In an account substantially confirmed by the testimony of two neighbors, James stated that defendant slammed on the brakes to "get [Colon] off [the hood of the car] and he went flying off." According to James, defendant backed up the car and drove it at Colon, who jumped on the hood a second time. James testified that defendant backed up again and drove forward, with Colon hanging on to the hood, swerving and turning around, eventually speeding up, running a stop sign and taking a right turn on to Mount Prospect Avenue, out of James' view. Defendant disputed that account, testifying that he never put the car in reverse or aimed it at Colon, whom he would never hurt "in a million years." He testified that he drove with Colon on the car punching the windshield and trying to break the windshield wiper, and when he stopped the car, Colon "fell off the hood of [the] car back first and hit his head on the pavement."

Defendant and Cordero immediately took Colon to a hospital, where he was admitted in critical condition in a coma. After a week on life support, he died. An autopsy determined that the cause of Colon's death was blunt impact injury to the head, and that his injuries were consistent with trauma caused by a fall from a moving vehicle onto pavement. Defendant and Cordero were questioned by police officers and arrested.

## II.

Defendant was indicted for purposeful or knowing murder in violation of *N.J.S.A.* 2C:11–3(a)(1), (a)(2), felony murder in violation of *N.J.S.A.* 2C:11–3(a)(3), first-degree robbery in violation of *N.J.S.A.* 2C:15–1, second-degree aggravated assault in violation of *N.J.S.A.* 2C:12–1(b)(1), second-degree conspiracy to commit rob-

bery in violation of *N.J.S.A.* 2C:15–1 and *N.J.S.A.* 2C:5–2, and two charges arising from his alleged use of his vehicle as a weapon: unlawful possession of a weapon in violation of *N.J.S.A.* 2C:39–5(d) and possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4(d). The trial court severed the charges against defendant from the charges against Cordero, and defendant was tried alone.

Defendant's trial, which began on June 5, 2007, barely touched upon the two issues at the center of this case, passion/provocation and self-defense. In their opening statements, neither the prosecutor nor defense counsel addressed either issue. Defense counsel did not characterize the death of Colon as the result of an emotional confrontation provoked by the victim; instead, he termed the case a "tragic series of events that winds up in an awful accident." The State presented the testimony of James, Colon's brother-in-law, the two neighbors who witnessed part of the incident, the employer who lent his car to Colon, the medical examiner, police officers and investigators. Prosecution witnesses offered no evidence suggesting that defendant's handling of his car was prompted by factors suggesting passion/provocation, or that he acted in self-defense.

Defendant called two of his brothers to testify that he was not prone to violence, and took the stand on his own behalf. Defendant stated that he and Colon had been in a romantic relationship and were living together when Colon departed for Newark. He characterized Colon as the initial aggressor in their altercation on May 2, 2004, and stated that after Colon kicked him and put him in a headlock, he retreated to his car. He testified that when Colon climbed on the car, Cordero screamed at him to "[j]ust go, go, go, just go," and defendant, "panicked," drove with Colon on the car. Defendant said that he was afraid that Colon's fist would break the windshield, and insisted that he did not intend or expect that Colon would be hurt when the car came to a stop.

After the defense rested, the trial court held a charge conference. The State requested a charge on passion/provocation, not-

withstanding its view that there was an insufficient basis in the record to establish its applicability, citing concerns about potential appellate review if the charge were not given. The defendant opposed a jury charge on passion/provocation, noting that "it confuses the jury if there's a provocation issue, it mitigates against the murder but I know it confuses the murder and puts them in the direction that we don't have facts to support." Notwithstanding the defendant's position, the trial court decided to charge the jury with respect to the passion/provocation statute. Neither the prosecution nor the defense requested a charge regarding self-defense.

In summation, defense counsel noted that the jury would be instructed about passion/provocation, commenting that the jury "will have to decide whether or not there was a passion about all of this," but argued that this issue was "not in the case." The prosecutor addressed passion/provocation in her summation, contending that the incident had not occurred suddenly, and that nothing transpired on the day of Colon's death "that would result in [defendant] actually being impassioned at this point." Justification by self-defense was not addressed in the defense summation, but was raised and refuted briefly in the summation of the prosecution. The trial court addressed passion/provocation in its instruction to the jury on the murder charge:

> If you find beyond a reasonable doubt that the defendant purposely or knowingly caused Julio Colon's death or serious bodily injury that then resulted in death and that he did not act, meaning Mr. Galicia did not act in the heat of passion resulting from a reasonable provocation, the defendant would be guilty of murder.

> If, however, you find that the defendant purposely or knowingly caused death or serious bodily injury that then resulted in death and that he did act[ ], meaning Mr. Galicia, in the heat resulting from a reasonable provocation, then the defendant would not be guilty of murder but would be guilty of passion/provocation manslaughter.

The trial court reviewed the elements of passion/provocation manslaughter. It recognized the State's burden to disprove passion/provocation, noting that an element of the murder charge was "that the defendant did not act in the heat of passion resulting

from reasonable provocation." There was no charge on the issue of self-defense.

Notwithstanding this correct instruction on passion/provocation, the verdict sheet, read to the jury at the close of the trial court's instruction and provided to the jury as a framework for its deliberations, suggested that the jury would only reach the issue of passion/provocation if it found the defendant guilty of murder. It read in relevant part:

**Count 4:** How do you find the defendant, Reynaldo Galicia, as to the charge of Murder?

Not Guilty _____ Guilty _____

If you find the defendant, Reynaldo Galicia, guilty as to the charge of Murder, do you find the defendant acted in the heat of passion resulting from a reasonable provocation?

Yes _____ No _____

If you find the defendant, Reynaldo Galicia, guilty as to the charge of Murder and/or Passion/Provocation Manslaughter, please move to Count 5. If you find the defendant not guilty as to the charge of Murder and/or Passion/Provocation Manslaughter, how do you find the defendant as to the charge of Aggravated Manslaughter?

Not Guilty _____ Guilty _____

If you find the defendant, Reynaldo Galicia, guilty as to the charge of Aggravated Manslaughter, please move to Count 5. If you find the defendant not guilty as to the charge of Aggravated Manslaughter, how do you find the defendant as to the charge of Reckless Manslaughter?

Not Guilty _____ Guilty _____

Please move on to Count 5.

Before the jury deliberated, the prosecutor objected to this portion of the verdict form, noting that "[i]t should be guilt as to the murder and/or passion/provocation manslaughter and then go to count five." Defense counsel agreed. However, the trial court did not rule on that objection or correct the verdict sheet.

The jury convicted defendant of aggravated manslaughter in violation of *N.J.S.A.* 2C:11–4(a)(1) as a lesser included offense of purposeful and knowing murder, second-degree aggravated assault in violation of *N.J.S.A.* 2C:12–1(b)(1), disorderly persons theft by unlawful taking in violation of *N.J.S.A.* 2C:20–3 as a

lesser included offense of robbery, and the two weapons charges.[1] The jury acquitted defendant of the remaining charges. The trial court merged defendant's convictions for the weapons offenses and aggravated assault into the conviction for aggravated manslaughter, and sentenced defendant to ten years in prison with an eighty-five-percent parole disqualifier, as well as five years of parole supervision and various fines. The trial court also sentenced defendant to a concurrent thirty-day prison term for the disorderly persons theft.

Defendant appealed his conviction and sentence, and an Appellate Division panel affirmed. The panel rejected defendant's challenge to *Grunow*, confirming the Legislature's determination that passion/provocation can mitigate murder, not aggravated manslaughter. It concluded that the trial court's correct instruction neutralized the mistake on the verdict sheet regarding passion/provocation, and that any error in the verdict sheet could therefore be regarded as harmless. The Appellate Division panel rejected defendant's claim that the trial court should have sua sponte charged the jury on the justification of the use of force in self-defense, given defendant's location in a locked car under his control at the time of the victim's injury. This Court granted defendant's petition for certification. *State v. Galicia,* 205 *N.J.* 101, 13 *A.*3d 364 (2011).

### III.

Defendant raises two issues regarding the passion/provocation statute, *N.J.S.A.* 2C:11–4(b)(2). First, pursuing an argument raised for the first time before the Appellate Division, he contends that this Court should reconsider its holding in *Grunow* on the ground that it was wrongly decided and is now outdated in the

---

[1] Although the record does not include a copy of the verdict sheet as completed by the jury, the transcript of the jury verdict indicates that with respect to Count Four of the indictment, the jury found defendant "not guilty" on the charge of murder and "guilty" on the charge of aggravated manslaughter. This verdict was confirmed by the trial court's polling of the jury.

wake of changes in sentencing law since it was decided. He urges that we either construe *N.J.S.A.* 2C:11–4(b)(2) to reduce first-degree aggravated manslaughter to voluntary manslaughter when committed in the heat of passion, or hold that the statute as drafted violates principles of equal protection. Defendant also challenges the trial court's verdict sheet on the grounds that the error in its wording precluded the jury from convicting defendant of passion/provocation manslaughter instead of aggravated manslaughter. Although he did not pursue a self-defense theory at trial, defendant also asserts that the trial court should have sua sponte instructed the jury regarding his right to use force in his own defense, pursuant to *State v. Concepcion,* 111 *N.J.* 373, 545 *A.*2d 119 (1988), and *State v. Gartland,* 149 *N.J.* 456, 694 *A.*2d 564 (1997).

The State urges the Court to reject defendant's challenge to *Grunow.* It contends that the Legislature's determination that passion/provocation can mitigate murder but not aggravated manslaughter is rational given the distinctions between the two crimes, and that changes in sentencing law since *Grunow* was decided do not alter the analysis. It further argues that the Legislature's limitation of passion/provocation mitigation to murder raises no equal protection concerns. The State contends that because the jury instruction on passion/provocation was proper, and there was no factual support in the record for a finding of passion/provocation, the verdict sheet did not give rise to reversible error. Finally, the State asserts that in the absence of a request to charge or of evidence supporting the justification of self-defense, the trial court's decision not to instruct the jury on that issue was correct.

## IV.

The New Jersey Criminal Code provides that a person who purposely, knowingly or recklessly causes the death of another person has committed criminal homicide. *N.J.S.A.* 2C:11–2(a). Our Code recognizes three forms of criminal homicide: murder,

manslaughter and death by auto. *N.J.S.A.* 2C:11–2(b). *N.J.S.A.* 2C:11–3(a) provides that criminal homicide constitutes murder when (1) "[t]he actor purposely causes death or serious bodily injury resulting in death;" (2) "[t]he actor knowingly causes death or serious bodily injury resulting in death;" or (3) a killing is committed in the course of one of several enumerated crimes, and thus constitutes felony murder. *N.J.S.A.* 2C:11–3(a). Murder is a crime of the first degree and is punishable by a minimum term of thirty years' imprisonment before the person convicted of it is eligible for parole. *N.J.S.A.* 2C:11–3(b)(1).

The Code recognizes voluntary and involuntary manslaughter; within involuntary manslaughter, the Code separately addresses aggravated and reckless manslaughter. *N.J.S.A.* 2C:11–4. Reckless manslaughter requires only "reckless" conduct causing the victim's death, imposing a lesser burden on the State than murder, which includes among its elements a "purposely or knowingly" mens rea. Involuntary manslaughter can constitute aggravated manslaughter, found when the actor "recklessly causes death under circumstances manifesting extreme indifference to human life," *N.J.S.A.* 2C:11–4(a)(1). The distinction between the two crimes turns on the degree of probability that the death will result from the defendant's conduct. When it is probable that death will result from that conduct, the standard for aggravated manslaughter is met, as the jury found in this case. *State v. Simon,* 161 *N.J.* 416, 507, 737 *A.*2d 1 (1999). However, when it is only possible that death will result, the homicide constitutes reckless manslaughter. *State v. Curtis,* 195 *N.J.Super.* 354, 364, 479 *A.*2d 425 (App.Div.), *certif. denied,* 99 *N.J.* 212, 491 *A.*2d 708 (1984). There is a significant difference between the penalties prescribed by the Legislature for these two crimes; while aggravated manslaughter is a first-degree crime punishable by a ten- to thirty-year prison term, reckless manslaughter is a second-degree crime punishable by five to ten years' imprisonment. *N.J.S.A.* 2C:11–4(c).

Voluntary manslaughter, also known as "passion/provocation manslaughter," occurs when a homicide which would otherwise be

murder under section 2C:11–3, other than felony murder, is "committed in the heat of passion resulting from a reasonable provocation." *N.J.S.A.* 2C:11–4(b)(2); *see also State v. Arriagas,* 198 *N.J.Super.* 575, 583, 487 *A.*2d 1290 (App.Div.1985), *aff'd sub nom. State v. Crisantos,* 102 *N.J.* 265, 508 *A.*2d 167 (1986). The Legislature has limited passion/provocation to crimes that would otherwise constitute murder, as opposed to manslaughter. *N.J.S.A.* 2C:11–4(b)(2). Voluntary manslaughter is punishable by a term of imprisonment of five to ten years. *N.J.S.A.* 2C:11–4(c).

This Court considered the standard for passion/provocation manslaughter in *State v. Pitts,* 116 *N.J.* 580, 611, 562 *A.*2d 1320 (1989), a death penalty case in which an expert had opined on the defendant's state of mind at the moment he killed a former girlfriend and an acquaintance. The Court held that the expert's testimony "that defendant's anger 'interfered with [his] cognitive ability [for] planning, judgment, recognizing consequences'" was consistent with passion/provocation manslaughter. *Id.* at 612, 562 *A.*2d 1320. The Court held that "the passion sufficient to sustain a passion/provocation manslaughter verdict must disturb a defendant's reason," noting that this passion must "'deprive[ ] the killer of the mastery of understanding, a passion which was acted upon before a time sufficient to permit reason to resume its sway had passed.'" *Ibid.* (quoting *State v. King,* 37 *N.J.* 285, 300, 181 *A.*2d 158 (1962)). "Involved is a concession to the frailty of man, a recognition that the average person can understandably react violently to a sufficient wrong and hence some lesser punishment is appropriate." *State v. Guido,* 40 *N.J.* 191, 209–10, 191 *A.*2d 45 (1963). Thus, "in a sense, murder has an extra element, the lack of passion or provocation." Cannel, *New Jersey Criminal Code Annotated,* comment 2 on *N.J.S.A.* 2C:11–3 at 294 (2011).

■ Passion/provocation manslaughter has four elements: "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; (4) a defendant who did not cool off before the slaying." *State v.*

*Josephs,* 174 *N.J.* 44, 103, 803 *A.*2d 1074 (2002) (citing *State v. Mauricio,* 117 *N.J.* 402, 411, 568 *A.*2d 879 (1990)). The amount of time that passes between the provocation alleged and the killing, and the precise sequence of events, are thus pivotal factors in this determination. The first two elements are "objective; thus, if they are supported by the evidence, the trial court should instruct the jury on passion/provocation manslaughter, leaving the determination of the remaining elements to the jury." *Ibid.* (citing *State v. Robinson,* 136 *N.J.* 476, 491, 643 *A.*2d 591 (1994)). In *Crisantos, supra,* 102 *N.J.* at 274, 508 *A.*2d 167, the Court noted the common law rule that "mutual combat" can in certain circumstances give rise to passion/provocation mitigation. However, that combat "must have been waged on equal terms and no unfair advantage taken of the deceased," unlike a setting in which the defendant uses a deadly weapon against an unarmed victim. *Ibid.* (quotation omitted).

The Legislature's constraints on the applicability of passion/provocation manslaughter were challenged in *Grunow, supra,* 102 *N.J.* at 136–44, 506 *A.*2d 708. In *Grunow,* the Appellate Division had concurred with the defendant that passion/provocation mitigation should be available to defendants charged with aggravated manslaughter as well as those charged with murder, and had reversed the defendant's aggravated manslaughter conviction for a killing arising from a "love triangle" among the defendant, his employee and the employee's husband, the victim. *Id.* at 134–35, 506 *A.*2d 708. Reversing the Appellate Division's decision, we applied the plain language of *N.J.S.A.* 2C:11–4(b)(2) to find that only murder can be downgraded to voluntary manslaughter by virtue of a finding of passion/provocation. *Id.* at 136–44, 506 *A.*2d 708. Tracing the history of passion/provocation as a component of New Jersey homicide law, we held that the unavailability of passion/provocation mitigation in manslaughter cases did not reflect a legislative oversight, as the defendant in *Grunow* suggested. *Id.* at 143–44, 506 *A.*2d 708. We concluded that having downgraded a crime committed with recklessness manifesting "extreme indifference to human life" from murder to man-

slaughter, the Legislature could plausibly determine that passion/provocation should not be available to mitigate that crime. *Ibid.* Accordingly, we held that the limitation of passion/provocation to murder represented a legislative determination intended to balance "the subjective ranges of criminal responsibility" advocated by the Criminal Law Revision Commission and "the Legislature's desire to return to objective levels of responsibility" that were part of New Jersey's common law. *Id.* at 141–42, 506 *A.*2d 708.

## V.

Defendant first challenges the Legislature's limitation of passion/provocation mitigation to murder. We consider legal and constitutional questions de novo. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

We concur with the Appellate Division that *N.J.S.A.* 2C:11–4(b)(2) makes clear that only murder can be mitigated by passion/provocation. We reject defendant's contention that the applicability of passion/provocation to murder but not manslaughter creates a logical absurdity, reflects a legislative oversight, or compels us to construe *N.J.S.A.* 2C:11–4(b)(2) contrary to its express terms. The Legislature is "presumed to be 'thoroughly conversant with its own legislation.'" *Grunow, supra,* 102 *N.J.* at 144, 506 *A.*2d 708 (quoting *Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969)). As we noted in *Grunow,* there is a plausible foundation for the distinction between murder and manslaughter that is manifested in *N.J.S.A.* 2C:11–4(b)(2):

> The Legislature recognized a single concept of reckless homicide that constituted manslaughter, with the gradation of punishment based upon the degree of risk of death. *State v. Curtis,* 195 *N.J.Super.* 354, 364 [479 *A.*2d 425] (App.Div.), *certif. denied,* 99 *N.J.* 212 [491 *A.*2d 708] (1984). Within this framework, the legislative scheme, as enacted, does not inevitably reflect an oversight with respect to the treatment of passion/provocation. The Legislature could have concluded, on the basis of common experience, that passion/provocation usually causes an intentional reaction and that it is rare for passion/provocation to lead to recklessness.
>
> [*Grunow, supra,* 102 *N.J.* at 143–44, 506 *A.*2d 708.]

While more than a quarter-century has passed since *Grunow* was decided, the Legislature has not amended the homicide provisions in the Code to authorize the mitigation of aggravated manslaughter by passion/provocation. The Legislature "knows how to express its disagreement with case law by amending a statute if it believes a court has misconstrued its intent." *Johnson v. Scaccetti,* 192 *N.J.* 256, 277, 927 *A.2d* 1269 (2007); *see also State v. Smith,* 197 *N.J.* 325, 334–36, 963 *A.2d* 281 (2009).

Defendant's argument that *Grunow* should be revisited because of changes in the sentencing laws is unavailing. The Legislature's decision, less than a year after *Grunow* was decided, to increase the sentencing exposure for a defendant convicted of aggravated manslaughter from a ten- to twenty-year range to a ten- to thirty-year range, *L.* 1986, *c.* 172, § 1, does not justify a departure from *Grunow* or a reassessment of the Legislature's intent in enacting *N.J.S.A.* 2C:11–4(b)(2). The Legislature's broadening of the sentencing range for aggravated manslaughter under *N.J.S.A.* 2C:11–4(c) underscores its considered judgment that a killing committed under "circumstances manifesting extreme indifference to human life" is a more serious crime than passion/provocation manslaughter. *See State v. Smith,* 58 *N.J.* 202, 213, 276 *A.2d* 369 (1971) (stating that "[i]n fixing a penalty for violation of its penal code, the Legislature may properly consider the elements of punishment, deterrence and rehabilitation"). Nor does the advent of extended sentences under the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, require us to revisit *Grunow.* The Legislature is presumed to be aware of the interplay between its statutes. *In re Petition for Referendum on Trenton Ordinance 09–02,* 201 *N.J.* 349, 359, 990 *A.2d* 1109 (2010) (quoting *State v. Federanko,* 26 *N.J.* 119, 129, 139 *A.2d* 30 (1958)); *Macedo v. Dello Russo,* 178 *N.J.* 340, 346, 840 *A.2d* 238 (2004) (quoting *Quaremba v. Allan,* 67 *N.J.* 1, 14, 334 *A.2d* 321 (1975)). In any event, murder, aggravated manslaughter and passion/provocation manslaughter are all NERA-eligible offenses. *N.J.S.A.* 2C:43–7.2. Accordingly, the Legislature's enactment of NERA does not alter the analysis.

■ Finally, on appeal, defendant for the first time raised a constitutional objection to *N.J.S.A.* 2C:11–4(b)(2), contending that the statute violates federal and state equal protection principles. *See U.S. Const.* amend. XIV; *N.J. Const.* art. I, § 1. Generally, an appellate court will not consider issues, even constitutional ones, which were not raised below. *Deerfield Estates, Inc. v. E. Brunswick,* 60 *N.J.* 115, 120, 286 *A.*2d 498 (1972); *State v. Walker,* 385 *N.J.Super.* 388, 410, 897 *A.*2d 411 (App.Div.) (citations omitted), *certif. denied,* 187 *N.J.* 83, 899 *A.*2d 305 (2006). Nonetheless, because *N.J.S.A.* 2C:11–4(b)(2) neither exposes a suspect class to disparate treatment nor affects a fundamental right, it survives constitutional scrutiny if it is "rationally related to the achievement of a legitimate state interest." *See State v. Lagares,* 127 *N.J.* 20, 34, 601 *A.*2d 698 (1992); *see also Doe v. Poritz,* 142 *N.J.* 1, 92, 662 *A.*2d 367 (1995) ("It is well settled that classifying offenders according to the offense committed is subject to rational basis analysis." (citing *Lagares, supra,* 127 *N.J.* at 36, 601 *A.*2d 698)). In enacting the Criminal Code, the Legislature "has wide discretion in the creation or recognition of different classes of offenders for separate treatment," *Smith, supra,* 58 *N.J.* at 207, 276 *A.*2d 369, and its enactments are entitled to a presumption of validity, *In re P.L. 2001, Chapter 362,* 186 *N.J.* 368, 392, 895 *A.*2d 1128 (2006); *Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957).

*N.J.S.A.* 2C:11–4(b)(2) withstands "rational basis" analysis. On the principle of deterrence alone, the Legislature could rationally conclude that aggravated manslaughter in violation of *N.J.S.A.* 2C:11–4(a)(1)—in which the circumstances demonstrate extreme indifference to human life—should be punished more harshly than passion/provocation manslaughter in violation of *N.J.S.A.* 2C:11–4(b)(2). Not only do the two crimes involve distinct levels of culpability, but they may pose different degrees of risk to the public and different deterrence considerations.[2] *N.J.S.A.* 2C:11–4(b)(2) withstands defendant's constitutional challenge.

---

[2] As a New York court stated, rejecting an equal protection challenge against an analogous statute, because "the 'heat of passion' killer ordinarily focuses on

Accordingly, even if passion/provocation mitigation were supported by the trial evidence, defendant's challenge to this Court's construction of *N.J.S.A.* 2C:11–4(b)(2), and to its constitutionality, would not warrant reversal of his conviction.

## VI.

We next consider whether the trial record in this case contained evidence that would have supported a finding of passion/provocation within the meaning of *N.J.S.A.* 2C:11–4(b)(2).[3] " 'The Court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.' " *Crisantos, supra,* 102 *N.J.* at 275, 508 *A.*2d 167 (quoting *N.J.S.A.* 2C:1–8(e)). We conclude that

---

one person and the depraved and reckless murderer usually acts more indiscriminately ... we cannot say that the legislative prerogative to authorize a mitigation-type defense to one crime and not the other is without a rational relationship to the purpose to be served." *People v. Wingate,* 72 *A.D.*2d 955, 422 *N.Y.S.*2d 245, 246 (1979).

[3] The dissent contends that the State is judicially estopped from raising this issue before the Court because the prosecutor, during the charge conference, "urged the trial court to give the passion/provocation defense charge." *Post* at 398, 45 *A.*3d at 330. The record, however, is not as straightforward as the dissent asserts. At the conference, the prosecutor stated that "[m]y view is it's not passion/provocation but it is an issue in the case. I think the jury needs to be advised that they can find that there was not adequate provocation or that there was no cooling off period." She elaborated on her view that the facts did not support a finding of passion/provocation. The prosecutor stated that "I don't believe that [passion/provocation]'s in the case," but she nonetheless "suggest[ed]" the court charge passion/provocation, citing concern about reversal on appeal absent the charge. Moreover, under the dissent's logic, defendant could be estopped from arguing before this Court that the facts support passion/provocation. Asked during the charge conference to state his position on a potential passion/provocation charge, defense counsel responded, "I think (A), it confuses the jury if there's a provocation issue, it mitigates against the murder but I know it confuses the murder and puts them in the direction that we don't have facts to support." In any event, the parties' stated positions at the charge conference do not constrain us from determining whether the record supports a finding of passion/provocation. *See McCurrie ex rel. Town of Kearny v. Town of Kearny,* 174 *N.J.* 523, 534, 809 *A.*2d 789 (2002).

there was no such "rational basis" for charging passion/provocation in the evidence presented to the jury.

In its decision to charge passion/provocation notwithstanding both parties' position that it was irrelevant to the case, the trial court cited the "intimacy" between defendant and Colon, and evidence that defendant "was upset both emotionally and physically by having been kicked and hit by Mr. Colon." Neither of these factors supports passion/provocation mitigation in this case. Although defendant and Colon had been romantically involved, there is nothing in the record that suggests that defendant operated his car in the critical moments before Colon's injury in a jealous rage or the "heat of passion." Defendant's trial strategy was to stress the lack of motive and the absence of forensic evidence supporting defendant's guilt, and to characterize Colon's death as a tragic accident. Defendant himself attributed his conduct to panic, not to fury, and no trial witness disagreed. His counsel argued in closing that there was no indication that defendant acted as a spurned lover when he drove his car with Colon on the hood. The State contended that there was no evidence supporting passion/provocation under *N.J.S.A.* 2C:11–4(b)(2).

Moreover, although defendant and Colon exchanged blows before defendant returned to his car, the victim in this case did not die in a physical altercation "waged on equal terms." *See Crisantos, supra,* 102 *N.J.* at 274, 508 *A.2d* 167 (quotation omitted). After defendant was struck by Colon, he retreated to the safety of a locked car that he owned and controlled. Minutes later, at the moment of Colon's fatal injury, defendant exercised that control to drive in a manner that precipitated Colon's death. Neither of the two "objective elements" of passion/provocation—reasonable and adequate provocation and an absence of adequate cooling-off time—is evidenced by the facts presented. Indeed, both the State and the defense recognized that the trial evidence did not support passion/provocation. Neither party took the position before the jury in opening or summation, in the examination of witnesses, or

in the charge conference, that passion/provocation mitigation was part of this case.

Accordingly, we hold that the trial court's decision to charge the jury regarding passion/provocation lacked the required foundation in the trial evidence.

## VII.

We review the trial court's verdict sheet under the standard of review prescribed by *Rule* 2:10–2, which provides that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interest of justice, notice plain error not brought to the attention of the trial or appellate court." *See also* Pressler Verniero, *Current N.J. Court Rules,* comment 2.4 on *R.* 3:19–1 (2012). We hold that the verdict sheet in this case contained an error, but on the record of this case, that error was incapable of producing an unjust result.

The verdict sheet, in conjunction with the jury charges, constitutes the trial court's direction to the jury. This Court has repeatedly emphasized the importance of correct jury instructions in criminal cases. "Accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." *Concepcion, supra,* 111 *N.J.* at 379, 545 *A.*2d 119; *see also State v. Butler,* 27 *N.J.* 560, 595, 143 *A.*2d 530 (1958). The charge must provide a " 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.' " *Concepcion, supra,* 111 *N.J.* at 379, 545 *A.*2d 119 (quoting *State v. Green,* 86 *N.J.* 281, 287–88, 430 *A.*2d 914 (1981)). We noted in *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990), that a jury charge "is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations."

A verdict sheet is an essential component of that road map. *Rule* 3:19–1(b) mandates its use:

A written verdict sheet shall be submitted to the jury in conjunction with a general verdict to facilitate the determination of the grade of the offense under the Code of Criminal Justice or otherwise simplify the determination of a verdict. The written verdict sheet shall include the factual predicate for an enhanced sentence or the existence of a fact relevant to sentencing unless that factual predicate or fact is an element of the offense. A written verdict sheet shall be reviewed prior to summation at which time either party may raise an objection. Any objections to the verdict sheet shall be placed on the record. The verdict sheet shall be marked as a court exhibit and retained by the court pursuant to Rule 1:2–3.

When there is an error in a verdict sheet but the trial court's charge has clarified the legal standard for the jury to follow, the error may be deemed harmless. In *State v. Gandhi*, 201 *N.J.* 161, 195–98, 989 *A.*2d 256 (2010), we held that the omission of one of several elements in the crime of stalking constituted harmless error, where the jury charge correctly listed all of the elements and the trial court "stressed the importance of his oral instructions over the content of the verdict sheet." *See also State v. Brooks*, 309 *N.J.Super.* 43, 65, 706 *A.*2d 757 (App. Div.), *certif. denied*, 156 *N.J.* 386, 718 *A.*2d 1215 (1998); *State v. Reese*, 267 *N.J.Super.* 278, 283–89, 631 *A.*2d 550 (App.Div.), *certif. denied*, 134 *N.J.* 563, 636 *A.*2d 521 (1993).

In contrast, the verdict sheet error in this case was not a simple omission easily rectified by the jury charge. The jury had no copy of the trial court's instructions in the jury room. It had only the verdict sheet as a written guide to structure its deliberations, and that verdict sheet directed it not to reach the issue of passion/provocation unless it found the defendant guilty of murder. That direction may have prevented the jury from considering passion/provocation simultaneously with its determination of defendant's guilt or innocence on the murder charge, as required by *N.J.S.A.* 2C:11–4(b)(2) and *State v. Coyle*, 119 *N.J.* 194, 223–24, 574 *A.*2d 951 (1990).[4] While the trial court correctly instructed

---

[4] In *Coyle, supra*, 119 *N.J.* at 222–24, 574 *A.*2d 951, we reversed the defendants' convictions on the basis of erroneous instructions directing the jury not to

the jury on this issue, the verdict sheet in this case had the potential to mislead. The error was brought to the trial court's attention by the State with the assent of defense counsel, but was not corrected. In contrast to the situation in *Gandhi*, the jury was not instructed that discrepancies between the charge and the verdict sheet should be resolved in favor of the former. We accordingly disagree with that portion of the Appellate Division panel's decision that found the verdict sheet not to constitute error.

 However, that error was harmless here and reversal of the conviction is not necessary. Because a verdict sheet constitutes part of the trial court's direction to the jury, defects in the verdict sheet are reviewed on appeal under the same "unjust result" standard of *Rule* 2:10–2 that governs errors in the jury charge. *See State v. Wilder*, 193 *N.J.* 398, 418, 939 *A.*2d 781 (2008). For an error to require reversal, there must be " 'some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict that it otherwise might not have reached.' " *State v. Lazo*, 209 *N.J.* 9, 26, 34 *A.*3d 1233 (2012) (quoting *State v. R.B.*, 183 *N.J.* 308, 330, 873 *A.*2d 511 (2005)); *see also State v. Docaj*, 407 *N.J.Super.* 352, 371, 971 *A.*2d 418 (App.Div.) (concluding "that the error in the charge did not lead the jury to a verdict that it otherwise might not have reached," in part, because "the evidence regarding passion/provocation manslaughter was relatively weak"), *certif. denied*, 200 *N.J.* 370, 982 *A.*2d 457 (2009). "The error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.' " *State v. Walker*, 203 *N.J.* 73, 90, 999 *A.*2d 450 (2010) (quoting *State v. Chapland*, 187 *N.J.* 275, 289, 901 *A.*2d 351 (2006)).

---

consider passion/provocation under *N.J.S.A.* 2C:11–4(b)(2) unless it acquitted defendant of murder.

As previously noted, neither the history of a romantic relationship between defendant and the victim nor the physical altercation between them before defendant returned to his car supported a jury finding of passion/provocation. By defendant's own account, reiterated by his attorney during summation, at the pivotal moment during the May 2, 2004 incident when his driving launched Colon from the car hood, defendant was not motivated by rage, rejection, jealousy or a prior physical attack, but by nervousness, panic and confusion. Defendant did not argue passion/provocation to the jury or seek an instruction on this issue. Passion/provocation under *N.J.S.A.* 2C:11–4(b)(2) had no foundation in the evidence. Accordingly, we find that the error in the verdict sheet was harmless, and did not deprive defendant of a fair trial.

### VIII.

Defendant's final contention is that the trial judge should have charged the jury on the justification of self-defense notwithstanding the fact that no party requested such a charge. We review the trial court's decision not to give this instruction under a plain error standard, in accordance with *Rule* 2:10–2.

Self-defense is one of several forms of justification recognized by our Code. *See N.J.S.A.* 2C:3–4. Justification is an affirmative defense in any prosecution based on conduct that is encompassed by the Code's justification provisions. *N.J.S.A.* 2C:3–1(a). A person may justifiably use force against another if he "reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." *N.J.S.A.* 2C:3–4(a). To avail himself of the justification of self-defense, the actor must have an " 'actual, honest, reasonable belief' " in the necessity of using force. *State v. Perry*, 124 *N.J.* 128, 161, 590 *A.*2d 624 (1991) (quoting *State v. Kelly*, 97 *N.J.* 178, 198, 478 *A.*2d 364 (1984)); *see also State v. Rivers*, 252 *N.J.Super.* 142, 148–49, 599 *A.*2d 558 (App.Div.1991). A defendant seeking to invoke the justification of self-defense must serve written notice on the State. *R.* 3:12–1.

 The Code circumscribes the justification of self-defense when the actor chooses to use deadly force, *N.J.S.A.* 2C:3–4(b)(2), defined as "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm," *N.J.S.A.* 2C:3–11(b). Automobiles—if intentionally used to cause death or serious bodily injury—can constitute "deadly force." *See State v. Griffith,* 336 *N.J.Super.* 514, 518–19, 765 *A.*2d 283 (App.Div.2001) (noting that in certain situations automobile can be used as "deadly weapon"); *see also United States v. Aceves–Rosales,* 832 *F.*2d 1155, 1157 (9th Cir. 1987) (holding that "[i]t is indisputable that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon"), *cert. denied,* 484 *U.S.* 1077, 108 *S.Ct.* 1056, 98 *L.Ed.*2d 1018 (1988); *Woodson v. AMF Leisureland Ctrs., Inc.,* 842 *F.*2d 699, 704 (3d Cir.1988) ("Automobiles represent the most lethal and deadly weapons today entrusted to our citizenry." (quotation omitted)).

 *N.J.S.A.* 2C:3–4(b)(2) provides that the use of deadly force is not justifiable "unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm," and is not justifiable if the actor "knows he can avoid the necessity of using it with complete safety" by means of a retreat, *N.J.S.A.* 2C:3–4(b)(2)(b). Justification by self-defense is similarly unavailable if a lesser degree of force could have been used to respond to an attack. *State v. Bryant,* 288 *N.J.Super.* 27, 37, 671 *A.*2d 1058 (App.Div.), *certif. denied,* 144 *N.J.* 589, 677 *A.*2d 761 (1996).

 A trial judge must sua sponte charge self-defense in the absence of a request—as defendant asserts should have been done here—"if there exists evidence in either the State's or the defendant's case sufficient to provide a 'rational basis' for its applicability." *State v. O'Carroll,* 385 *N.J.Super.* 211, 236, 896 *A.*2d 1125 (App.Div.) (quotation and emphasis omitted), *certif. denied,* 188 *N.J.* 489, 909 *A.*2d 724 (2006). The evidence must "clearly indicate[ ]" such a defense to call for such an instruction in the

absence of a request to charge. *Perry, supra,* 124 *N.J.* at 161, 590 *A.2d* 624 (emphasis omitted).[5]

Accordingly, our inquiry is whether the evidence presented to the trial court clearly indicates a foundation for the justification of self-defense. We concur with the Appellate Division panel that the evidence does not do so. Defendant's use of the automobile—driving the vehicle directly at an individual, then traveling several blocks disregarding stop signs with a person clinging to the hood of the car, and braking and accelerating the car to cause the person to fall off the hood—constitutes an exercise of deadly force. Moreover, that deadly force was used at a time when defendant was in minimal—if any—danger, at the wheel of a locked vehicle, with a windshield between him and an unarmed man. Moreover, prior to each of the two contacts between defendant's car and Colon, defendant had the option to drive away from the scene instead of aiming for the victim, and is accordingly not entitled to invoke the justification of self-defense. *See N.J.S.A.* 2C:3–4(b)(2)(b). We therefore affirm the determination of the Appellate Division panel with respect to the issue of self-defense.

## IX.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

In this tragic case involving a lovers' quarrel gone madly awry, the trial court—at the prosecutor's request—charged the jury on the defense of passion/provocation manslaughter. I agree with the majority's holding that the verdict sheet on passion/provocation manslaughter had the clear capacity to mislead the jury and

---

[5] The issue here is not whether jury instructions on self-defense are sufficiently tailored to the specific case, as it was in *Gartland, supra,* 149 *N.J.* at 476–77, 694 *A.2d* 564, and *Concepcion, supra,* 111 *N.J.* at 379, 545 *A.2d* 119, upon which defendant relies. Instead, the issue is whether a charge on self-defense was required at all.

cause an unjust result. However, I disagree with the majority's determination that there was insufficient evidence to warrant a charge on the passion/provocation manslaughter defense.

The majority reaches this mistaken conclusion—and therefore the unjust result of affirming defendant's aggravated manslaughter conviction—by not applying the appropriate standard of review that governs a trial court's decision to give a jury charge. The majority should have determined whether a rational juror—viewing the evidence in the light most favorable to a passion/provocation manslaughter defense—could have returned a verdict of passion/provocation manslaughter. The majority takes just the opposite approach, viewing the evidence in the light most unfavorable to defendant. Moreover, the State should have been judicially estopped from arguing on appeal that the evidence did not support passion/provocation manslaughter because it requested the charge at trial.

Viewed through the appropriate legal lens, the facts present a classic case of passion/provocation manslaughter. Because the majority has turned the legal standard on its head, Reynaldo Galicia will receive no relief from this unjust verdict. Moreover, the stretch to justify this conviction will cast in doubt the well-settled jurisprudence governing the charging of defenses and lesser-included offenses in general. I therefore respectfully dissent.

I.

A.

A trial court's "primary obligation is to see that justice is done, and that a jury is instructed properly on the law and on all clearly indicated lesser-included offenses, even if at odds with the strategic considerations of counsel." *State v. Garron,* 177 *N.J.* 147, 180, 827 *A.*2d 243 (2003). In other words, "where the facts on record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no

one's strategy, or assumed (even real) advantage can take precedence over that public interest." *Ibid.* (quoting *State v. Powell*, 84 *N.J.* 305, 319, 419 *A.*2d 406 (1980)) (internal quotation marks omitted).

Passion/provocation manslaughter is a lesser-included offense of murder, *State v. Robinson*, 136 *N.J.* 476, 482, 643 *A.*2d 591 (1994), and "has four elements: (1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." *State v. Josephs*, 174 *N.J.* 44, 103, 803 *A.*2d 1074 (2002) (citing *State v. Mauricio*, 117 *N.J.* 402, 411, 568 *A.*2d 879 (1990)). The first two elements are judged by an objective standard and the remaining two by a subjective standard. *Mauricio, supra*, 117 *N.J.* at 411, 568 *A.*2d 879. If the objective elements are supported by the evidence, the trial court must instruct the jury on passion/provocation manslaughter. *Josephs, supra*, 174 *N.J.* at 103, 803 *A.*2d 1074.

In determining whether "to instruct a jury on passion/provocation manslaughter, a trial court should view the situation in the light most favorable to the defendant." *Mauricio, supra*, 117 *N.J.* at 412, 568 *A.*2d 879. So long as there is a version of the facts that will support a finding of passion/provocation manslaughter, the trial court is bound to give the charge. It is important to note that the State bears the burden of disproving passion/provocation manslaughter. *Ibid.* Therefore, a trial court should only withhold the charge if no rational juror could "conclude that the State had not proven beyond a reasonable doubt that the asserted provocation was insufficient to inflame the passions of a reasonable person." *Ibid.*

B.

Here, the evidence viewed in the light most favorable to defendant reveals that a charge on the defense of passion/provocation manslaughter was clearly warranted. Defendant and Julio Colon

met in an Internet chat room. In February 2004, Colon moved into defendant's family home in Williamstown, and the two began an intimate relationship. Defendant provided some financial support to Colon who was out of work at the time. Defendant purchased a car for Colon, apparently on credit, with defendant keeping the title to the vehicle in his name. Because Colon was unable to make the required payments for the car and its insurance, defendant asked him to stop driving it.

On April 30, 2004, Colon borrowed a sport utility vehicle (SUV) from his former employer, Ken Sheppard. The next morning, Colon told defendant he was going to get a haircut and then visit his mother, but Colon did not return home. Defendant's efforts to contact Colon by telephone proved fruitless. In search of Colon, defendant called Hector Cordero—Colon's jealous ex-boyfriend. Defendant identified himself as Colon's "new lover." Cordero told defendant that Colon was not with him. Given their mutual interest in Colon, the two decided to meet. Defendant and Cordero got together on the evening of May 1, and talked all night while seated in defendant's car. Cordero pined for his lost lover, Colon, and after awhile the two men fell asleep.

On the morning of May 2, defendant and Cordero visited Sheppard to see whether Colon had returned the borrowed SUV. Colon had not, and Sheppard indicated he intended to report his vehicle as stolen. Fearing that Colon would be arrested, defendant and Cordero offered to find and retrieve the vehicle. In the meantime, defendant suspected that Colon was cheating on him and that Colon had gone to the Newark home of his friend, Irwin Castro. Defendant and Cordero—both of whom were still in love with Colon—then drove to the Newark apartment building where Castro lived. They rang the bell to Castro's apartment, but another man, Edward James, opened the door. James claimed that Colon was not in the apartment.

Defendant walked back to his parked car on Mount Prospect Avenue while Cordero stood outside the apartment building, yelling, "Julio, Julio, I know you're there. I know you're there.

Please come out." James then exited the building and threatened to call the police if Cordero did not stop disturbing the neighborhood. Defendant implored Cordero to leave: "Let's just go home. I don't want any trouble."

At some point, James and Cordero apologized to each other, and James returned to his apartment. As defendant and Cordero were about to leave, Cordero spotted Sheppard's SUV on East Delevan Avenue. Defendant parked his car behind the SUV, and then Cordero entered the unlocked vehicle. Cordero carried out some of Colon's belongings, including a yellow rose, a cell phone defendant had given Colon, and a diamond ring. When defendant asked Cordero why he had taken the items, Cordero just rambled on and announced that he was going to call Colon's sister.

Defendant told Cordero that he wanted to go home and intended to call Sheppard and inform him where he could find his SUV. Defendant began driving, but Cordero begged him to "just wait for a few more minutes" to see if Colon would return to the SUV. Defendant relented and parked his car on Clifton Avenue. Both men became emotional and began to cry. Just as they were about to leave, Colon, Castro, and James came walking down East Delevan Avenue.

Cordero got out of the car and began pleading with Colon, "Don't do this, don't do this. Please come home. Please come home. Please come home with me." Colon told him, "[I]t's over." As Colon got into the driver's seat of the SUV and turned the ignition on, Cordero climbed into the passenger side. Cordero wrestled Colon for the keys, screaming, "Please don't do this, please don't do this." At that point, James started shouting that he was going to call 9–1–1.

Defendant then left his car and approached the SUV, begging Colon to stop and talk to him. In response, Colon kicked defendant in the stomach and chest and then put him in a headlock. Cordero freed defendant from Colon's grasp. Defendant—beaten, distressed, and emotionally wounded—stated he had "had enough" and was going home.

Defendant returned to his car, where Cordero was already seated, and locked the doors. As defendant started his car, Colon leapt on top of the hood, punching the windshield and attempting to break the windshield wipers. Cordero shouted at defendant to "go, go, go, go." Panicked and in shock, defendant began driving—with Colon on the hood, hanging onto the wipers while hammering the windshield with his hands. As defendant drove, Colon punched the windshield so hard that defendant feared that he "might break through the glass," injuring both them and himself. According to defendant, at first Colon started falling off the hood, but he managed to pull himself back on. Kneeling on all fours, Colon continued to pound the windshield. Defendant was confused and panicked from Colon's assault on the windshield and Cordero's command to "go, go, go, go."

Eventually, defendant brought the car to a stop, abruptly enough that Colon fell off the hood and struck his head on the pavement. Defendant was "in shock." He "never thought ... that [Colon] would get hurt." Defendant immediately got out of the car and began screaming to anyone within earshot: "Oh my God. Oh my God. Please help me. Please help me." He and Cordero lifted Colon into the car and rushed him to the nearest hospital. Colon died from his injuries seven days later.

## C.

The combustible, emotional confrontation between defendant, Cordero, and Colon—sparked by spurned love and jealousy and fueled further by the physical blows exchanged on the street—set in motion the crazed car ride that led to Colon's unfortunate death. A reasonable jury could believe that when Colon jumped onto the hood of the car and began pummeling the windshield with his fists, defendant reacted in the heat of passion, and without adequate time to cool off. This is the evidence in the record, which, if believed by a jury, would support a verdict of passion/provocation manslaughter.

The version presented in the majority's opinion, although supported by the record, is not seen through a lens favorable to defendant. That is the mistake made by the majority. The trial court—as it should—gave defendant the benefit of the best case to support a passion/provocation defense, *see Mauricio, supra,* 117 *N.J.* at 412, 568 *A.*2d 879, and determined that it had "to put [the defense] before the jury." Moreover, the trial court was in the best position to decide the need for a passion/provocation defense charge. The trial court was exposed, first-hand, through the testimony of the witnesses, to the emotionally charged and confused events that led to this tragedy. "We ordinarily defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." *N.J. Div. of Youth & Family Servs. v. E.P.,* 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008).

The trial court explained in precise detail its reasons for instructing on the passion/provocation defense, stating

I believe based upon what I have read that passion/provocation manslaughter is in this case. . . .

We have testimony that there was intimacy between the defendant and the decedent. We have testimony that the[re] had been prior intimacy between the codefendant, Cordero[,] and the victim. There is testimony, uncontroverted testimony that the defendant and Cordero went up to Newark to see or confront or whatever term you want to substitute in its place, Mr. Colon, but as a backdrop to this, there is some information ongoing relating to intimacy.

[Defendant], as I recall, testified that when he got out of the vehicle and went over by the truck for whatever reason to assist Mr. Cordero or to break things up, then he was struck by the victim. He was upset both emotionally and physically by having been kicked and hit by Mr. Colon. I think a reasonable jury could [infer] that the action thereafter w[as] the result of passion/provocation. That he was rejected that he had spent some time with [him] some months earlier, a romantic, intimate relationship with and I think that the State should have to disprove, in effect, that the defendant wasn't acting in the heat of passion resulting from a reasonable provocation whether they so find whether the murder was committed and I think it's in the case.

Those findings are fully supported by the record when viewing the evidence in a light favorable to a passion/provocation defense. Significantly, the Appellate Division did not disturb the trial

court's conclusion that a passion/provocation defense was appropriate, given the evidence of record.

The trial court correctly disregarded the legal jockeying of defense counsel who was willing to gamble on an outcome better than passion/provocation manslaughter. In giving the passion/provocation defense charge, the trial court was guided by the jurisprudence of this Court. In *Garron*, we reminded trial courts that "the integrity of the justice system and the fact-finding process is not subordinate to the singular interests of the parties," and that lesser-included offenses clearly indicated by the record should be charged to the jury. 177 *N.J.* at 180, 827 *A.*2d 243.

### D.

Last, it bears repeating that the State urged the trial court to give the passion/provocation defense charge and then—in a complete about-face—argued before this Court that the trial court erred in giving the charge. That legal pirouette is at odds with the doctrine of judicial estoppel, which is "designed to protect the integrity of the judicial process by not permitting a litigant to prevail on an issue and then to seek the reversal of that favorable ruling." *McCurrie ex rel. Town of Kearny v. Town of Kearny*, 174 *N.J.* 523, 534, 809 *A.*2d 789 (2002). In *McCurrie*, when the Town took a position before this Court "entirely contrary to its position in the trial court," we held that the Town's "about-face [was] a blatant violation of the principle of judicial estoppel." *Id.* at 533, 809 *A.*2d 789. Because the State "prevailed" in having the trial court give the passion/provocation defense charge, "principles of judicial estoppel demand that [it] be bound by its earlier representations." *See Guido v. Duane Morris LLP*, 202 *N.J.* 79, 94, 995 *A.*2d 844 (2010).

### E.

In summary, the evidence supported the giving of the passion/provocation defense charge, the State pressed the trial court to give the charge, and the court provided a detailed explanation—

grounded in the record—for instructing on that lesser-included offense of murder. This Court has no cause to reverse the trial court's decision to charge on passion/provocation manslaughter.

## II.

I also believe that this Court mistakenly decided *State v. Grunow*, 102 *N.J.* 133, 144, 506 *A.*2d 708 (1986), when it concluded that passion/provocation manslaughter is available as a defense to a person who purposely or knowingly kills (murder) but not to a person who kills recklessly under circumstances manifesting extreme indifference to human life (aggravated manslaughter). As a consequence of that interpretation of *N.J.S.A.* 2C:11–4(b)(2), a defendant who purposely shoots and kills his spouse's lover, after chancing upon the infidelity, is eligible for a reduction of murder to the second-degree crime of passion/provocation manslaughter, but the defendant who recklessly and with extreme indifference to human life fires a warning shot, not intending to but yet killing the lover is ineligible for the passion/provocation defense and must face sentencing for the first-degree crime of aggravated manslaughter.

The Appellate Division in *Grunow* held that "[i]t would ... lead to [an] absurd result" if a defendant charged with murder could seek a reduction to passion/provocation manslaughter, but a defendant charged with aggravated manslaughter could not. *State v. Grunow*, 199 *N.J.Super.* 241, 251, 488 *A.*2d 1098 (App.Div.1985). Despite acknowledging that the panel's reasoning "ha[d] an inherent logic," the *Grunow* Court felt constrained by the language of *N.J.S.A.* 2C:11–4(b)(2). *Grunow, supra*, 102 *N.J.* at 138, 506 *A.*2d 708. That statute provides that "[a] homicide which would otherwise be murder under [*N.J.S.A.*] 2C:11–3 [and] is committed in the heat of passion resulting from a reasonable provocation" constitutes manslaughter. *N.J.S.A.* 2C:11–4(b)(2). Aggravated manslaughter requires a lesser degree of culpability than purposeful or knowing murder, *N.J.S.A.* 2C:11–3(a)(1) and (2): recklessness "under circumstances manifesting extreme indifference to human

life." *N.J.S.A.* 2C:11–4(a)(1). The *Grunow* Court read the plain language of the aggravated manslaughter statute as not providing for the option of a reduction to passion/provocation.

However, to avoid an absurd result that the Legislature could not have intended, the Court should have read the passion/provocation defense consistent with the statute that permits the charging of lesser-included offenses, *N.J.S.A.* 2C:1–8(d). *See Di-Prospero v. Penn,* 183 *N.J.* 477, 492–93, 874 *A.*2d 1039 (2005). Aggravated manslaughter is a lesser-included offense of murder. *State v. Rivera,* 205 *N.J.* 472, 489 n. 8, 16 *A.*3d 352 (2011). Because passion/provocation is a defense to murder, it follows that it is likewise a defense to aggravated manslaughter, which is a lesser-included offense of murder. Construing *N.J.S.A.* 2C:1–8(d) as logically applying to the passion/provocation statute would permit *N.J.S.A.* 2C:11–4(b)(2) to be read in the following fashion: a defendant who, "in the heat of passion resulting from a reasonable provocation," commits "murder," or the lesser-included offense of aggravated manslaughter, is guilty of manslaughter.

Such an approach is not a stretch, but a common-sense application of our existing lesser-included-offense jurisprudence. Passion/provocation would then be available to reduce aggravated manslaughter to manslaughter. This logical reading of *N.J.S.A.* 2C:11–4(d)(2) harmonizes the statute with the rest of the Code of Criminal Justice. The absence of legislative action since the *Grunow* decision is not necessarily evidence of an intelligent design. Legislative inaction is not always a sign of acquiescence with one of our decisions. *See State v. Hudson,* 209 *N.J.* 513, 536, 39 *A.*3d 150 (2012) ("Legislative inaction is a thin reed generally on which to base an interpretive argument."); *State v. Haliski,* 140 *N.J.* 1, 16, 656 *A.*2d 1246 (1995) (" '[O]ne must ignore rudimentary principles of political science to draw any conclusions regarding [current legislative] intent from the *failure* to enact legislation.' " (quoting *Johnson v. Transp. Agency,* 480 *U.S.* 616, 671–72, 107 *S.Ct.* 1442, 1472, 94 *L.Ed.*2d 615, 656 (1987) (Scalia, J., dissenting))).

### III.

In conclusion, there was ample support in the record for the trial court's charge on passion/provocation manslaughter. The fatally flawed verdict sheet was "clearly capable of producing an unjust result," *R.* 2:10–2, and therefore defendant's conviction of aggravated manslaughter should be reversed. I am convinced that *Grunow* was wrongly decided and that the Appellate Division in *Grunow* came to the right result, for the reasons I have expressed. I therefore respectfully dissent.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—5.

*For reversal*—Justice ALBIN—1.