**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1607-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROBERT C. MCGRANAHAN,

    Defendant-Appellant.

_____

> Argued January 21, 2025 – Decided May 28, 2025
>
> Before Judges Sabatino, Gummer, and Jacobs.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 13-06-0874.
>
> Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the brief).
>
> Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Nancy A. Hulett, of counsel and on the brief).

PER CURIAM

In 2016, defendant Robert C. McGranahan was tried before a jury on charges of first-degree murder, N.J.S.A. 2C:11-3(a)(1), and third-degree possession of a weapon (a knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d). The jury acquitted defendant of murder but convicted him of the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and the weapon charge. This court reversed the convictions and remanded the case for a new trial because the trial court had erred in "fail[ing] to instruct the jury that self-defense was a complete justification for manslaughter offenses as well as for murder." State v. McGranahan, No. A-5050-16 (App. Div. Feb. 27, 2020) (slip op. at 3-4).

At the second trial in 2022, the jury convicted defendant of the same offenses. Defendant appeals those convictions and the resulting sentence. We are constrained to vacate the convictions and remand again because in the second trial, the court erred in denying defendant's request to instruct the jury on the offense of passion/provocation manslaughter.

## I.

The crimes charged relate to the homicide of Edward Demko and the events that took place between defendant and Demko at Demko's townhouse during the early morning hours of March 9, 2013. The State contended

A-1607-22

defendant had taken a knife from Demko's kitchen and, with no provocation, attacked Demko and fled the scene. Defense counsel portrayed Demko as the initial attacker, pulling a knife on defendant after defendant had refused to have sex with him, and defendant as the victim, who had defended himself after getting the knife away from Demko.

At 2:37 a.m. on March 9, 2013, the Sayreville Police Department received two 9-1-1 calls from Demko's landline telephone. The first call was abandoned. On the second call, the 9-1-1 dispatcher could hear a voice but could not discern what the caller was saying. The dispatcher sent an ambulance and police officers to Demko's home.

Patrolman David Wilkins was one of the responding officers. On arrival, he found the glass storm door closed but unlocked and the inside entryway door wide open. After receiving no response to ringing the doorbell, knocking, and announcing himself as a police officer, Wilkins entered the house. He noticed on a stairway to the left leading to the main living area blood smears on the staircase walls, railings, and carpet. He went up the stairs to the living room, which showed signs of a struggle: the couch cushions were covered in blood and appeared to have slash marks; the couch pillows were bloody and out of place; blood was on the floor, wall, and light switch; and the carpet under the

coffee table was bunched up.  Two glasses and a beer can were on the coffee table, with coasters underneath them and no spilled liquid.  According to Wilkins, the kitchen also showed signs of a struggle, with blood on the walls, blinds, floor, and sink.  In the master bedroom, Wilkins found condoms and two sex toys, one on the floor and one in the bed.

In the hall area separating the living room from the dining area and the kitchen, Wilkins observed Demko lying on the ground, on his right side.  Blood was on the bottom of his socks; he was clutching the blade of an eight-inch steak knife with his left hand; and he held in his right hand a cordless telephone.  Paramedics pronounced Demko deceased at the scene.

An autopsy revealed Demko had died from two stab wounds, either of which could have been fatal:  one on his left front chest, which penetrated his left lung; and one on his back, which punctured his right lung.  According to the medical examiner who performed the autopsy, both wounds could have occurred with Demko face-to-face with his assailant, and the wounds were consistent with the knife found in Demko's hand.  However, the medical examiner could not state for certain the knife was the weapon used by the assailant.

Demko also had abrasions on his nose and left shin and a number of superficial incised wounds, including one on his shoulder, two on his face, eight

4

on his left hand, and four on his right hand. The medical examiner testified that the cuts on Demko's face could have been sustained when he fell and his face hit the ground. He characterized Demko's hand injuries as defensive wounds and said they were indicative of a struggle. However, he clarified his testimony did not rule out Demko as having been the initial aggressor in that struggle.

Between 2:45 a.m. and 4:00 a.m. on March 9, 2013, defendant called and texted friends. Shanna Bernhard testified defendant had texted and called her numerous times that morning, beginning at about 2:45 a.m. He pleaded with her to call him, told her he had been stabbed, and asked for help. She initially responded by text, telling him he was drunk and to leave her alone. Eventually, however, she called him back. He "seemed frantic" "[a]nd his voice was really low." She told him that if he had been stabbed, he needed to go to the police, and she hung up on him.

Kaitlyn Sullivan testified defendant had called and texted her repeatedly between 3:00 a.m. and 4:00 a.m. on March 9, 2013. She did not answer the phone calls or respond to the messages. In the text messages, defendant told her "it was an emergency" and he was hurt, and he asked her to answer the phone and come get him.

A-1607-22

Timothy Hudson, defendant's childhood friend, testified that in the early morning hours of March 9, 2013, defendant had called him and asked him to come and pick him up. Hudson described defendant as sounding "nervous" and "[d]efinitely frightened, scared." According to Hudson, defendant told him he had had a sexual interaction with a man; the man had attacked him while they were watching a movie; he might have stabbed the man; he had run outside; he was cold and shirtless because his shirt was "covered in blood"; and he was hiding under a tree. Hudson told defendant he could not pick him up and that he should call the police or his parents.

After receiving a call from defendant's mother at about 4:00 a.m. or 4:30 a.m. that morning, defendant's father called defendant, found out his approximate location, and went to pick him up. He eventually saw defendant "come out from the trees" with "nothing on from the waist up" even though "it was about 28 degrees" and snowing. According to his father, defendant "was very sluggish" and "in a little bit of a shock. He was a little out of it." His father noticed defendant had some blood on the side of his head, suggested they go to the police so defendant could give them his "side of the story," and drove them to the Old Bridge Police Department.

A-1607-22

According to Patrol Sergeant Ronald Nitto, defendant and his father arrived at the police station at about 5:00 a.m. Nitto noticed blood on defendant's face, head, hands, and jeans but did not see any wounds or injuries that would account for the amount of blood on him. Nitto described defendant as "look[ing] extremely cold, and almost like he was in some sort of state of shock or something like that." According to Nitto, defendant "at first . . . wasn't even able to talk." Eventually, defendant told Nitto he had met a man online and the man picked him up and brought him to his house, where they engaged in consensual sex. They stopped, drank vodka, and watched a movie. Defendant told Nitto the man had wanted to have sex again, but defendant refused and the two of them "had some sort of fight or altercation after that." Defendant did not tell Nitto he had been stabbed or that he had stabbed anyone.

Concerned defendant might have hyperthermia, Nitto called for an ambulance, and defendant was taken to a nearby hospital. Nitto called the Sayreville Police Department and advised the officer in charge they "had what seemed to be an assault victim . . . come into [the Old Bridge P]olice [D]epartment." The officer in charge informed Nitto the Sayreville Police Department was investigating what appeared to be a homicide in a townhouse complex and asked that an Old Bridge officer follow defendant to the hospital

7

until a Sayreville officer could get to the hospital to determine if there was a connection between defendant and the townhouse homicide.

Old Bridge Police Officer Gregory Goy, Lieutenant James Napp from the Middlesex County Prosecutor's Office, and Nitto went to the hospital. Goy testified that when he spoke with defendant at the hospital, defendant told him he had been assaulted and his partner had attacked him. Napp took photos of defendant at the hospital. Those photos revealed dark staining in and around defendant's right eye; multiple incision wounds on defendant's right and left hands; and large, fresh scratches on defendant's back. Napp testified defendant did not have any injuries that would "equate" to the amount of blood he had on him.

In the emergency room, a nurse asked defendant what had happened and why he was at the hospital. According to the nurse, defendant told her he had been "assaulted by his partner." Defendant initially denied a weapon was involved and told the nurse he had been hit with a fist. However, when the nurse asked him a second time, defendant "said that he had struggled with his – an altercation with his partner and that he was chasing him and he saw that he had a knife, so he struggled with him, he got hold of the knife, and then he said he stabbed him."

A-1607-22

On cross-examination, the nurse testified:

Q. Mr. McGranahan told you that he got assaulted by his partner.

A. Yes.

Q. He told you that he struggled with him.

A. Yes.

Q. He told you that he got the knife away from him.

A. He got hold of the knife.

Q. And then he told you that he stabbed him.

A. Yes.

Nitto testified he had overheard the nurse ask defendant if his "mate" had done "this" to him and heard defendant respond, "I had a knife, I think I might have stabbed him."

The first and second trials differed. Because the jury in the first trial had acquitted defendant of the murder charge, the highest charge defendant faced in the second trial was aggravated manslaughter. Certain facts that had been elicited during the first trial were not presented during the second trial. Defendant testified in the first trial but not in the second trial. At the second trial, unlike the first trial, the court excluded under N.J.R.E. 403 a statement defendant had made to police on March 11, 2013, while he was in custody. The

9

court described that statement as "not provid[ing] any new information not already provided . . . ."[1] In the first trial, the court included a passion/provocation manslaughter charge in its jury instructions.

In the second trial, after the close of evidence, defense counsel asked the court to include in its jury instructions a charge on passion/provocation manslaughter. He argued the evidence provided "a rational basis to let the jury decide" whether defendant had been "adequately provoked."

After hearing argument, the court denied defense counsel's request. The court acknowledged the passion/provocation manslaughter charge had been given in the first trial but found "this is a completely different trial, and this case was tried very differently than it was the first time." The court held the evidence in the first trial that "would have provided a rational basis for the jury to consider passion/provocation . . . is not here in this case." The court found that in the second trial only "some snippets of information" had been presented that would support a passion/provocation manslaughter charge, citing the testimony by the nurse, Nitto, and Goy about what defendant had said to them about his encounter

---

[1] We acknowledge the trial court's submission of a corrected Statement of Reasons regarding its decision to exclude defendant's March 11, 2013 statement. Because that exclusion decision is not a subject of this appeal, that correction has no impact on this opinion.

A-1607-22

with Demko. The court concluded those "snippets" were not sufficient to support the charge.

The court instructed the jurors on the elements of aggravated manslaughter and reckless manslaughter, consistent with the model charge. See Model Jury Charges (Criminal), "Murder and Aggravated/Reckless Manslaughter, N.J.S.A. 2C:11-3a(1)(2); 2C:11-4a, b(1)" (rev. June 13, 2011). After giving those instructions, the court charged that self-defense was a complete defense to both of the manslaughter offenses and the State had an obligation to disprove self-defense beyond a reasonable doubt. The self-defense charge was consistent with the model charge. See Model Jury Charges (Criminal), "Justification – Self-Defense in Self-Protection" (rev. Nov. 13, 2023). The court next instructed the jury on possession of a weapon for an unlawful purpose and on how the self-defense justification applied to that crime. Defendant did not object to those aspects of the charge.

The verdict sheet provided for possible verdicts on aggravated manslaughter, reckless manslaughter, and possession of a weapon for an unlawful purpose. It did not contain a question on self-defense. Defendant did not object to the verdict sheet.

11

On the morning of the second day of deliberations, juror number nine informed one of the court officers that during the lunch break taken after closing arguments, she and two other jurors had had a conversation with Demko's brother, without realizing who he was until later. Called during the trial by the State as a witness, he had testified about Demko's previous long-term relationship, the death of Demko's partner, and Demko's health. After advising counsel outside the presence of the jury about the information provided by the court officer, the court questioned individually the three jurors who had spoken with Demko's brother. Those jurors told the court and counsel they had engaged in small talk, about food or the weather, with Demko's brother. They also stated they could remain fair and impartial. The State asserted no further action needed to be taken. Defense counsel contended the court should question each juror and indicated his intention to move for a mistrial.

The court interviewed the remaining jurors, each of whom denied having any interactions with anyone affiliated with the case or having any knowledge of other jurors interacting with any affiliated person. The following transpired with juror sixteen:

> THE COURT: Sixteen. All right. Just a few questions for you. At any point in time during this trial, have you had any interactions with anyone that you know to be affiliated with [t]his case?

12

JUROR 16: No.

THE COURT: Have you been a witness to any of your fellow jurors having any interactions with anyone that you know to be affiliated with this case?

JUROR 16: No.

THE COURT: Lastly, have you been within earshot of any discussions from your fellow jurors about any interactions with anyone affiliated with this case?

JUROR 16: Just in deliberations.

THE COURT: I'm sorry. Just in deliberations?

JUROR 16: Just in deliberations, yeah.

THE COURT: Okay. So, in other words, when you talk about – I don't want you to tell me the --

JUROR 16: All right.

THE COURT: -- the contents of your deliberations, but my question is very specific. Have you had interactions with your fellow jurors about any interactions they have had with witnesses outside of – with – with witnesses connected to this case?

JUROR 16: No.

THE COURT: Okay. All right. So, I ask that with regard to this specific discussion that we're having here that you not have that discussion with any of your fellow jurors, all right?

JUROR 16: Mmm-hmm.

THE COURT:  Thank you, sir.

Defense counsel did not request any further questioning of the jurors and made no specific argument with respect to juror number sixteen.  Counsel argued only that Demko's brother "knew what he was doing" and had intentionally approached the jurors and engaged with them in order to "warm up to" them and "bolster his brother."  The court denied the motion, finding the jurors had been "very forthright in their responses" and that the interaction with Demko's brother would not impact their ability to be fair and impartial.

The jury found defendant guilty of aggravated manslaughter and possession of a weapon for an unlawful purpose.  Defendant subsequently moved for a new trial based on the omission of the passion/provocation charge and Demko's brother's interaction with the three jurors.  After hearing argument, the court denied the motion and conducted a sentencing hearing.

The court found aggravating factors one ("[t]he nature and circumstances of the offense, . . . including whether or not it was committed in an especially heinous, cruel, or depraved manner"), three ("risk that the defendant will commit another offense"), six (extent and seriousness of the defendant's criminal history), and nine (need to deter the defendant and others) and gave them "great weight."  N.J.S.A. 2C:44-1(a)(1), (3), (6), and (9).  The court found no

14

mitigating factors.  The court imposed a sentence of twenty-five years for the aggravated-manslaughter conviction, subject to the parole disqualifier mandated under the No Early Release Act, N.J.S.A. 2C:43-7.2.  The court did not merge the convictions but imposed a concurrent sentence of four years on the weapon conviction.  The court entered the amended judgment of conviction on December 15, 2022.

This appeal followed.

## II.

We begin by addressing defendant's first argument.  He describes that argument in his merits brief as:

> POINT I
>
> THE JUDGE COMMITTED REVERSIBLE ERROR WHEN SHE DENIED THE DEFENDANT'S REQUEST FOR A JURY INSTRUCTION ON THE LESSER-INCLUDED HOMICIDE OFFENSE OF PASSION/PROVOCATION MANSLAUGHTER.

"Proper jury charges are essential to a fair trial."  State v. Bragg, ____ N.J. ____, ____ (2025) (slip op. at 22).  A "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the fact that the jury may find.'"  State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). Erroneous

15

charges on fundamental issues are presumed to constitute reversible error. State v. Carrero, 229 N.J. 118, 127 (2017).

"A trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it." State v. Funderburg, 225 N.J. 66, 80 (2016). "However, some of the trial court's decisions, such as the charging of lesser-included offenses, are governed by statute." Id. at 81. N.J.S.A. 2C:1-8(e) provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Thus, when reviewing a trial court's decision to deny a defendant's request for "a specific instruction," we "consider whether a rational basis for giving the instruction existed." State v. A.L.A., 251 N.J. 580, 595 (2022). Under the rational-basis test, we "determin[e] whether 'the evidence presents a rational basis on which the jury could (1) acquit the defendant of the greater charge and (2) convict the defendant of the lesser.'" Carrero, 229 N.J. at 128 (quoting State v. Brent, 137 N.J. 107, 117 (1994)). To make that determination, we, like the trial court, must "examine the record thoroughly to determine if the rational-basis standard has been satisfied." State v. Crisantos, 102 N.J. 265, 278 (1986); see also State v. Canfield, 252 N.J. 497, 501 (2023) (same).

16

"If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error." Carrero, 229 N.J. at 128; see also Canfield, 252 N.J. at 500 (finding trial court must give a requested charge on a lesser-included offense "if, viewing the evidence in the light most favorable to the defendant, there is a 'rational basis in the record for doing so'" (quoting State v. Denofa, 187 N.J. 24, 42 (2006))); Crisantos, 102 N.J. at 271 ("if there is plausible evidence in the record to support a conviction of a lesser degree of criminal homicide, and a jury instruction on the lesser offense is requested, it is error not to submit that issue to the jury").

"The rational-basis test sets a low threshold." A.L.A., 251 N.J. at 595 (quoting Carrero, 229 N.J. at 128). "A defendant is entitled to a lesser-included offense instruction rationally supported by the evidence, even if the instruction is inconsistent with the defense theory." Carrero, 229 N.J. at 128. Moreover, "in deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." A.L.A., 251 N.J. at 595.

"Passion/provocation manslaughter is an intentional homicide committed under extenuating circumstances that mitigate the murder." State v. Robinson, 136 N.J. 476, 481 (1994); see also State v. Galicia, 210 N.J. 364, 378-79 (2012)

17

(finding passion/provocation manslaughter applicable "when a homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3 . . . is 'committed in the heat of passion resulting from a reasonable provocation'") (quoting N.J.S.A. 2C:11-4(b)(2)).[2]  Passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), consists of four elements:  (1) adequate provocation; (2) insufficient time for the defendant to cool off between the provocation and the killing; (3) the defendant was actually impassioned by the provocation; and (4) the defendant had not cooled off before the killing.  Carrero, 229 N.J. at 129.

"The first two elements are assessed objectively, while the third and fourth are 'more subjective because they relate to the defendant's actual response.'"

---

[2]  We recognize aggravated manslaughter was the highest charge defendant faced in the second trial because defendant had been acquitted of murder in the first trial and that passion/provocation manslaughter is not a lesser-included offense of aggravated manslaughter.  Galicia, 210 N.J. at 379, 381-82; State v. Grunow, 102 N.J. 133, 135, 144 (1986).  However, despite a murder acquittal, passion/provocation manslaughter should be charged along with aggravated manslaughter at a retrial if the facts presented at the retrial support the charge.  See Grunow, 102 N.J. at 149 (holding "if the evidence presented at the retrial warrants, the court can clarify that passion/provocation manslaughter may be an available verdict if the jury finds from the evidence the State has proven the elements of that offense beyond a reasonable doubt"); State v. Pridgen, 245 N.J. Super. 239, 251 (App. Div. 1991) (same); see also Brent, 137 N.J. at 117 ("whether the lesser offense is strictly 'included' in the greater offense, as defined by N.J.S.A. 2C:1-8(d), is less important to a trial court's determination to charge the offense than whether the evidence presents a rational basis on which the jury could acquit the defendant of the greater charge and convict the defendant of the lesser.").

Ibid. (quoting Robinson, 136 N.J. at 490). Thus, "[t]o warrant the passion/provocation jury charge, the evidence must rationally support only the first two elements; the subjective elements 'should usually be left to the jury to determine.'" Ibid. (quoting State v. Mauricio, 117 N.J. 402, 413 (1990)); see also Crisantos, 102 N.J. at 275 ("Because the issue of passion/provocation can arise in an infinite number of factual settings, mitigation of homicide because of passion/provocation is ordinarily a question for the jury, unless the evidence is so weak as to preclude jury consideration.").

The first element requires proof of provocation "sufficient to arouse the passions of an ordinary [person] beyond the power of [his or her] control." Carrero, 229 N.J. at 129 (alterations in original) (quoting Mauricio, 117 N.J. at 412) (internal quotation marks omitted). "Words alone are insufficient to create adequate provocation," but the presence of a weapon could be sufficient, as could battery. Ibid.; see also State v. Taylor, 350 N.J. Super. 20, 39-40 (App. Div. 2002) (citing examples from cases). As for the second element, no per se time period to cool off is required; instead, there must be a showing of insufficient time for a reasonable person in the defendant's position to cool off. Carrero, 229 N.J. at 129-30.

Viewing the evidence most favorably to defendant, the facts elicited at the second trial reflected: Demko and defendant met online and engaged in a consensual sexual encounter; thereafter, the two engaged in a struggle that ended in Demko's death by stabbing, with either of the two significant wounds sufficient to have killed him; at 2:37 a.m., on March 9, 2013, the Sayreville Police Department received two 9-1-1 calls from Demko's landline telephone; the police found Demko holding a knife in one hand; defendant left Demko's home, with no shirt on in twenty-eight degree weather, after which he hid in a copse of trees; just eight minutes after Demko's 9-1-1 call, at 2:45 a.m., defendant began making repeated text messages and phone calls to friends and family, in which he seemed frantic and frightened, stated he had been attacked and might have stabbed someone, and asked for help; defendant repeated these statements to the police and to medical personnel, in which he also indicated Demko had wanted more sex, which defendant refused, and that Demko had hit him with a fist and had been in possession of a knife, which defendant was able to take from Demko and used to stab him; and defendant had injuries that were arguably consistent with his description of having been attacked and then part of a struggle for the knife. See, e.g., Carrero, 229 N.J. at 130 (presence of weapon could have provoked a reasonable person in the defendant's position);

Mauricio, 117 N.J. at 414 ("a threat with a gun or knife might constitute adequate provocation" and "battery, except for a light blow, has traditionally been considered, almost as a matter of law, to be sufficiently provocative").

Those facts, and the reasonable inferences that could be drawn from them, required the court to issue a passion/provocation charge because they could rationally be understood to show: (1) adequate provocation, that is, an assault by Demko, first with fists, and then with a knife; and (2) insufficient time for defendant to cool off between the provocation and the killing, as defendant allegedly stabbed Demko in the midst of the assault. The remaining, subjective elements – whether defendant was actually impassioned by the provocation and whether he had not cooled off before the killing – should have been determined by the jury. Carrero, 229 N.J. at 129; Mauricio, 117 N.J. at 413.

As the State points out, defendant did not testify at the second trial and the evidence presented at each trial was not exactly the same. But defendant was not obligated to testify for passion/provocation manslaughter to be charged. He was permitted to rely on the entirety of the evidence. See, e.g., State v. O'Carroll, 385 N.J. Super. 211, 229-33, 236-37 (App. Div. 2006) (holding that totality of evidence, including version of events from defendant's statement to police, warranted charge on lesser-included offenses). And asking the jury to

21

consider that evidence for passion/provocation manslaughter would not have constituted an improper call on the jury to speculate, as the State argues. Rather, the jury could have drawn inferences from the facts elicited, which is entirely permissible and exactly what the State otherwise asked the jury to do.

The court erred in not considering the evidence in the light most favorable to defendant, in applying a too-high threshold to the rational-basis test, and in denying defendant's request to give the passion/provocation charge. Because of those errors, we must vacate defendant's convictions and remand the case for a new trial.

III.

For the sake of completeness, we briefly address defendant's remaining arguments on other issues. In his merits brief, defendant described them as:

> POINT II
>
> THE JURY INSTRUCTIONS AND VERDICT SHEET REPEATEDLY ERRONEOUSLY TOLD THE JURY TO CONVICT DEFENDANT OF HOMICIDE IF, AFTER CONSIDERATION OF ALL THE EVIDENCE IN THE CASE, THE JURY MERELY BELIEVED THAT ALL OF THE <u>ORDINARY</u> ELEMENTS OF THE HOMICIDE CRIMES WERE PROVEN BY THE STATE BEYOND A REASONABLE DOUBT – A CLEAR ERROR IN A CASE WHERE SELF-DEFENSE IS AT ISSUE.

22

POINT III

THE JUDGE FAILED IN HER ROLE AS "GATEKEEPER" OF THE TRIAL WHEN SHE CONDUCTED AN INSUFFICIENT VOIR DIRE OF THE JURY WHEN IT BECAME CLEAR THAT A STATE WITNESS, THE BROTHER OF THE DECEDENT, HAD SPOKEN TO SOME JURORS FOR FIVE MINUTES DURING A BREAK FROM COURT.

POINT IV

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE, AND THE CONVICTIONS SHOULD HAVE MERGED.

A.

Defendant concedes that, unlike the court in the first trial, the court in the second trial instructed the jury that self-defense was a complete defense, which the State had to disprove, to aggravated manslaughter and reckless manslaughter. Defendant now argues the court erred in charging self-defense separately from aggravated manslaughter and reckless manslaughter, rather than within the charges for each alleged crime. Defendant claims the jury charge as structured created an inherent contradiction between what the jury had been told about its ability to convict defendant for aggravated manslaughter or reckless manslaughter and the State's obligation to disprove self-defense. Defendant faults the court for not telling the jury "how to reconcile" those "completely

contradictory commands." Defendant also faults the court for not including a question about self-defense on the verdict sheet. At trial, defendant did not object to the charge or verdict sheet on this basis.

"[A] party may generally not 'urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict.'" State v. Macchia, 253 N.J. 232, 251 (2023) (quoting R. 1:7-2). If a defendant raises on appeal a challenge to a jury charge he did not make before the trial court, we evaluate that challenge under a plain-error standard of review. Bragg, ___ N.J. at ___ (slip op. at 21). Under that standard, an unchallenged error constitutes plain error only "if it was 'clearly capable of producing an unjust result.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2). When considering a challenge to a jury instruction, we "read the charge as a whole, and not just the challenged portion, to determine its overall effect." A.L.A., 251 N.J. at 591; see also Baum, 224 N.J. at 159 ("The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997))).

Applying that standard, we conclude defendant has not established plain error regarding this aspect of the jury charge. We perceive nothing misleading

or contradictory regarding the elements of the alleged crimes and self-defense in the charge or how the charge was structured. State v. Bryant, 288 N.J. Super. 27, 33, 40 (App. Div. 1996) (finding no plain error in court's "failing to refer to the justifications of self-defense and defense of others in its instructions on the elements of murder"). Moreover, the self-defense charge was not so remote in these relatively short instructions that the jury would have been confused about the State's burden both to prove the elements of the charged offenses and also to disprove self-defense.

Our Supreme Court has "recognize[d] the importance of the verdict sheet as 'an essential component' of the trial court's 'road map' for the jury's deliberations." State v. Cuff, 239 N.J. 321, 340 (2019) (quoting Galicia, 210 N.J. at 387). "Jurors are likely to refer, and refer often, to the directions on the verdict form." Ibid. (alteration omitted) (quoting State v. Nelson, 173 N.J. 417, 449 (2002)). "Thus, 'we encourage completeness and consistency in the preparation of verdict sheets.'" Id. at 340-41 (quoting State v. Gandhi, 201 N.J. 161, 198 (2010)). However, "[a] verdict sheet is intended for recordation of the jury's verdict and is not designed to supplement oral jury instructions." Id. at 341 (quoting Gandhi, 201 N.J. at 196). Because jury instructions "serve as the jury's primary guide as it considers the charges and the evidence," errors in a

verdict sheet can be regarded as harmless unless the verdict sheet was misleading. Id. at 341.

Although the better course may have been to include questions about self-defense on the verdict sheet, see, e.g., State v. Martinez, 480 N.J. Super. 470, 479 (App. Div. 2025), we perceive no plain error in the omission of those questions from this verdict sheet. The trial court's oral instructions correctly conveyed the State's burden of proof on the elements of the charged offenses and on disproving self-defense. We see nothing in the verdict sheet that contradicted those oral instructions or that could have caused juror confusion. We see nothing erroneous or misleading about the verdict sheet. See State v. Branch, 301 N.J. Super. 307, 328 (App. Div. 1997) (holding "omission of self-defense from verdict sheet" did not constitute plain error because "[t]he verdict sheet merely represents the possible verdicts the jury could reach" and "[t]here is no verdict per se of 'self-defense.'"), rev'd in part on other grounds, 155 N.J. 317 (1998).

B.

Criminal defendants have the right to a fair trial by an impartial jury. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. Trial courts have a duty to secure and preserve an impartial jury in order to protect that right. State v. Loftin, 191 N.J.

26

172, 187 (2007). That duty includes an obligation to insulate the jury from outside influences that could taint its deliberations. State v. Morgan, 217 N.J. 1, 11, 14 (2013).

"[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." State v. R.D., 169 N.J. 551, 557-58 (2001); see also State v. McGuire, 419 N.J. Super. 88, 153 (App. Div. 2011). The court should question the juror at issue, in the presence of counsel, to determine if his or her ability to be impartial has been impacted. R.D., 169 N.J. at 558, 560. If so, the court should expand its inquiry to determine whether other jurors have been affected. Id. at 558. "The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary." Ibid.; accord State v. Bey, 112 N.J. 45, 83-89 (1988).

"A new trial . . . is not necessary in every instance where it appears an individual juror has been exposed to outside influence." R.D., 169 N.J. at 559. However, if it appears a jury has been tainted by outside influences that have a capacity to affect the outcome of the case, a new trial should be granted. Ibid.; Loftin, 191 N.J. at 190; Bey, 112 N.J. at 91.

27

Ultimately, the decision whether to grant a mistrial is within the discretion of the trial court because the trial court is in the best position to determine if the jury has been tainted based on a consideration of "the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." R.D., 169 N.J. at 559. We review a trial court's decision on a mistrial motion for an abuse of discretion. Ibid.; see also State v. Smith, 224 N.J. 36, 47 (2016) (stating mistrial motions are reviewed for abuse of discretion).

The court acted "swiftly and decisively" in addressing the jury issue. State v. Williams, 93 N.J. 39, 63 (1983). The court initially questioned the three jurors who had had contact with Demko's brother and then separately questioned each of the remaining jurors. The court ultimately concluded the interactions of the three jurors with Demko's brother were innocuous. The court accepted the jurors' statements they could remain fair and impartial, and that finding is entitled to deference. State v. Singletary, 80 N.J. 55, 64 (1979).

Defendant's proposed interpretation on appeal of juror sixteen's remarks – that the jurors had discussed their interactions with Demko's brother during deliberations – is not supported by the record. No one involved in the trial who

had heard juror sixteen's remarks, including defendant's trial counsel, expressed a similar interpretation of those remarks, and no counsel asked for any further inquiry of juror sixteen or the other jurors.

On that record, we discern no abuse of discretion in the court's handling of the jury issue or denial of defendant's mistrial motion.

C.

We review a trial court's sentencing decision under an abuse-of-discretion standard. State v. Konecny, 250 N.J. 321, 334 (2022). "We 'must not substitute [our] judgment for that of the sentencing court.'" State v. Vanderee, 476 N.J. Super. 214, 235 (App. Div.) (alteration in original) (quoting State v. Liepe, 239 N.J. 359, 370 (2019)), certif. denied, 255 N.J. 506 (2023). We apply that deferential standard as long as the sentencing court "follow[ed] the [Criminal] Code and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014); see also State v. Trinidad, 241 N.J. 425, 453 (2020). Thus, we affirm a sentence "unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Rivera, 249 N.J. 285, 297-98 (2021) (alteration

in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)); see also Vanderee, 476 N.J. Super. at 235. We remand for a resentencing if the trial court "fail[ed] to provide a qualitative analysis of the relevant sentencing factors on the record." State v. Fuentes, 217 N.J. 57, 70 (2014).

Defendant argues we must vacate his sentence because the court erred in (1) not merging the weapon conviction into the aggravated-manslaughter conviction; (2) finding aggravating factor one and giving it great weight; and (3) giving great weight to aggravating factor six. The State agrees the court erred in not merging the convictions. Had we not vacated the convictions, we would have vacated the sentence and remanded for a resentencing on that ground.

We otherwise perceive no abuse of discretion in court's sentencing decision. The court's finding and weighing of the aggravating factors were supported by the evidence presented at trial and the court's qualitative assessment of defendant's criminal history. See Fuentes, 217 N.J. at 75-77 (explaining the factors to consider when applying aggravating factor one); State v. Thomas, 188 N.J. 137, 153 (2006) (explaining the factors to consider when applying aggravating factor six).

A-1607-22

IV.

In sum, we vacate the convictions and remand for a new trial because the court erred in not giving the passion/provocation manslaughter charge. Had we not vacated on that basis, we would have vacated the sentence and remanded for resentencing because the court erred in not merging the weapon conviction into the aggravated-manslaughter conviction.

We do not render this decision lightly. We recognize the State, defendant, the deceased's family, and the witnesses now face a third trial regarding a brutal killing that took place more than a decade ago. But the fairness of a trial is at the core of our justice system, and we cannot overlook the error that rendered this trial unfair. We are constrained to vacate the convictions and remand to the trial court for a new trial.

Vacated and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1607-22