# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3651-24
A-3652-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.T. and C.J.,[1]

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.J.
III, a minor.

_____

     Submitted February 3, 2025 – Decided March 12, 2026

     Before Judges Gilson, Perez Friscia, and Vinci.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FG-21-0102-25.

---

[1] We refer to the parties and the children by initials and fictitious names to protect their privacy.  <u>R</u> 1:38-3(d)(12).

Jennifer N. Sellitti, Public Defender, attorney for appellant A.T. in A-3651-24 (Deric Wu, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant C.J. in A-3652-24 (Bruce P. Lee, Designated Counsel, on the briefs).

Jennifer Davenport, Acting Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Nicholas Dolinksy, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor C.J. III (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants A.T. and C.J., the biological parents of C.J., III (Charlie), appeal from a June 30, 2025 judgment of guardianship terminating their parental rights to Charlie. A.T. contends the Division of Child Protection and Permanency (Division) failed to prove prongs three and four of N.J.S.A. 30:4C-15.1(a). Specifically, she argues the court's prong three analysis was deficient because it considered the caregiver's preference for adoption over kinship legal guardianship (KLG) as dispositive and its prong four analysis was incorrect because both the Division's expert and A.T.'s expert agreed termination of parental rights (TPR) would do more harm than good.

C.J. contends the court "erroneously concluded that adoption was in Charlie's best interest[s] when considering prong [three] overlapping with prong [four]." He additionally argues the law guardian failed to represent Charlie's interests, provided ineffective assistance of counsel to Charlie, and that the court improperly considered prejudicial and inadmissible hearsay statements.

Based on our review of the record and applicable law, we are satisfied the record evidence supports the decision to terminate defendants' parental rights by clear and convincing evidence. Accordingly, we affirm substantially for the reasons set forth by Judge John J. Abromitis in his thorough and well-reasoned fifty-one-page written opinion. We will not recite in detail the history of the Division's interactions with defendants. Instead, we incorporate by reference the factual findings and legal conclusions contained in the court's opinion. We add the following comments.

I.

A.T. has two living biological children in addition to Charlie: R.T., born in 2008, and F.T., born in 2014. Defendants had another child together, P.J., who was born in October 2018, but tragically died in December 2018.

The Division's involvement with defendants began in 2017, when it received a referral regarding A.T.'s drug use and a physical altercation between

A.T. and her mother, B.Y. After A.T. was arrested for assault and C.J. was arrested for obstruction, B.Y. was granted emergency temporary custody of R.T. and F.T. A.T. completed a substance abuse evaluation (SAE) but declined the recommended intensive outpatient (IOP) treatment.

In August 2018, when A.T. was pregnant with P.J., her physician reported to the Division that she tested positive for marijuana and opiates at a pre-natal appointment. She subsequently tested positive for marijuana, suboxone, oxymorphone, and oxycodone. A.T. completed another SAE and again refused to comply with the recommended IOP treatment.

On December 6, 2018, P.J., who was six weeks old, was found unconscious in bed between defendants and was pronounced dead. On December 10, defendants both tested positive for oxycodone and oxymorphone. After completing SAEs, A.T. was recommended for intensive inpatient treatment and C.J. for IOP treatment, which they refused.

In January 2019, the Division implemented a safety protection plan after a January 6, 2019, domestic violence incident between defendants that resulted in their arrests. B.Y. was granted custody of R.T. and F.T. pursuant to an order entered in a separate Family Part matter. They have remained in the care of their grandparents, B.Y. and F.Y., since that time

In January 2019, A.T. tested positive for benzodiazepines, cocaine, and oxycodone. In July 2019, C.J. tested positive for oxycodone. On November 24, 2019, while A.T. was pregnant with Charlie, A.T. reported to law enforcement that C.J. choked her during a fight and C.J. was arrested.

When Charlie was born in December 2019, he tested positive for cocaine and A.T. tested positive for Subutex and cocaine. Charlie experienced withdrawal symptoms and remained hospitalized for several days.

By July 2020, the Division reunited Charlie with defendants with sole custody granted to C.J. and supervised contact by A.T. A.T. repeatedly tested positive for substances, including fentanyl, methamphetamine, and opiates. The Division received five additional referrals between March 2021 and December 2022 regarding substance use, domestic violence, and supervision concerns. In March 2022, C.J. was arrested for driving while intoxicated. In April 2022, police responded to a hospital concerning a suspected overdose by A.T. and confiscated three vials of suspected heroin from her. In May 2022, police executed a search warrant for defendants' residence and A.T. was arrested after she was found in possession of heroin, cocaine, and methadone.

C.J. provided urine screens in February and July 2022 that were positive for substances, including oxycodone, oxymorphone, methamphetamine, fentanyl, and cocaine. On December 9, 2022, C.J. appeared to pass out in his

car while waiting at the Division's office to do a drug screen, became agitated with Division workers, and "appeared to be under the influence." Between August 2022 and October 2023, A.T. was requested to submit to urine screens approximately twenty-five times, which she generally refused to do. She submitted one urine screen, which was positive for amphetamines and fentanyl.

Throughout 2023, the Division attempted to stabilize the family by offering defendants substance abuse and mental health services, but they refused to comply with the recommended services. In June 2023, Charlie was placed with C.J.'s grandmother, M.P., by way of a family agreement between defendants and M.P. Defendants were limited to supervised visits with Charlie at M.P.'s home.

In October 2023, the New Jersey State Police (NJSP) investigated defendants for distributing controlled dangerous substances (CDS) from their residence and completed two controlled buys of fentanyl from the residence. On November 14, 2023, M.P. dropped Charlie off at defendants' residence unsupervised in violation of the terms of the family agreement. While Charlie was in the residence with defendants unsupervised, NJSP executed a search warrant. They seized fentanyl, methamphetamine, and cocaine "concealed in

6

multiple locations . . . including in the children's toys and areas easily accessible to the child," and three "large homemade explosive devices."

Defendants were arrested and charged with multiple offenses, including first- and second-degree CDS offenses, second-degree endangering the welfare of a child, and third-degree possession of destructive devices. While being processed at the jail, addition fentanyl and other CDS was found on C.J.'s person. Defendants were released on conditions pending trial.

The Division emergently removed Charlie from M.P.'s care and placed him with B.Y. and F.Y. The Division substantiated defendants and M.P. for abuse and neglect. Charlie has lived with his grandparents and older siblings since November 2023.

The Division continued to offer services to defendants. In March 2024, the Division referred them to psychiatric evaluations, which they never completed. In April 2024, the Division referred them for SAEs, which neither attended. The Division rescheduled A.T. for a psychiatric examination on May 1, 2024, which she failed to attend. C.J. also failed to complete a rescheduled psychiatric evaluation.

In July 2024, while defendants were visiting Charlie at a Division office, A.T. took Charlie from the building insisting that the Division did not have

authority to keep him. Police arrived as A.T. was attempting to place Charlie in her car and she was arrested.

On October 31, 2024, C.J. was found unconscious in his vehicle and arrested on an outstanding warrant and for possession of drug paraphernalia and unlawful possession of a knife. On November 14, just over a week after he was released from jail, C.J. was arrested again and incarcerated for possession of a BB gun.

In October 2024, the Division changed its permanency plan from reunification to adoption by B.Y. and F.Y. The Division explored KLG with B.Y. and explained the differences between KLG and adoption. B.Y. understood the differences and expressed her desire to adopt Charlie to live with her, F.Y., and Charlie's older siblings. The Division also explored numerous other placement options, including defendants' parents, siblings, and a cousin who were all unable or unwilling to adopt. M.P. was not a viable option because she was substantiated for neglect following the November 2023 incident, when she left Charlie unsupervised at defendants' residence.

On November 12, 2024, the Division filed its complaint for guardianship of Charlie. A six-day guardianship trial was conducted from April to June 2025.

The Division called Dr. Kinya Swanson as an expert in psychology, parental fitness, and bonding. Dr. Swanson completed a psychological evaluation with defendants, bonding evaluations with both defendants and Charlie, and a bonding evaluation with B.Y. and F.Y.

Dr. Swanson concluded Charlie should remain with his grandparents and be free for adoption. She noted that if defendants' "rights were terminated, . . . there would be some level of harm, emotional or psychological harm to [Charlie]." However, "his . . . grandparents have the skills and have evidenced the ability to mitigate a good amount of that potential harm through the level of security, love, affection, resources, [and] the family unit that they have there." Dr. Swanson concluded terminating parental rights would not cause more harm than good and "the potential for harm would be adequately mitigated by the resource parents."

The law guardian called Dr. Leslie Trott as an expert in the area of psychology, parental fitness, and bonding. Dr. Trott conducted a parenting fitness and a bonding evaluation of A.T., a parenting fitness evaluation of C.J, and a comparative bonding evaluation with the grandparents. Regarding the bonding evaluation of A.T., Dr. Trott testified A.T. "did a reasonably good job of keeping [Charlie's] behavior in control . . . [b]ut it was clear that he was limited in how he showed affection towards her. . . . He was distancing

emotionally from her." He opined Charlie had a "significant emotional void inside of him, that he suffered through some adverse childhood experiences." Dr. Trott did not consider there to be a significant bond between Charlie and A.T.

During Dr. Trott's evaluation of C.J., he "started to sag into the table and his head began to nod . . . [and] he was not able to control the pencil." Dr. Trott told C.J. he believed he was impaired and C.J. "lost his temper and he said . . . I do[ not] have to finish this evaluation and . . . he walked out." Dr. Trott attempted to convince C.J. to stay and told him that his son was there waiting to visit with him but C.J. refused to stay.

A.T. called Dr. Bianca Kazoun as an expert in psychological evaluations, bonding evaluations, and parental fitness. Dr. Kazoun interviewed A.T. and conducted a bonding evaluation between her and Charlie to assess "the appropriateness of [KLG]." Dr. Kazoun testified A.T.'s "insight into the problems that she was experiencing was poor." Regarding the bonding evaluation, Dr. Kazoun found that "their bond was strong and secure." Dr. Kazoun did not recommend adoption because she thought that "there is a potential for [Charlie] to suffer enduring harm from severing the relationship [with A.T.] . . . [b]ecause the nature of their bond was so strong."

A-3651-24

Dr. Kazoun conceded A.T. was not capable of parenting full-time at the time. Dr. Kazoun recommended KLG and family therapy but did not recommend reunification based on the "incarceration," "drug use," and failure to "follow through with services." She stated, "I mean, you know, in maintaining an environment where [A.T.] does[ not] need to be supervised." She thought all those factors are important before considering reunification.

On June 30, 2025, the court issued its written opinion, finding the Division had proved by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a), and entered an order terminating defendants' parental rights. This appeal followed.

II.

Our "scope of review on appeals from orders terminating parental rights is limited." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 256 (App. Div. 2019). We review the trial court's factual findings "in accordance with a deferential standard," N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023), and its findings "generally should be upheld so long as they are supported by 'adequate, substantial, and credible evidence.'" M.M., 459 N.J. Super. at 256 (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We defer to the factual findings of the family court due to that court's special expertise in family

matters and the limitations of reviewing a cold record. See N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "We will not overturn a family court's fact[ ]findings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)) (internal quotation marks omitted).

Having reviewed the record, we rely upon the court's findings, which are all supported by substantial credible evidence. We also agree with the trial court's legal conclusions regarding all four prongs of N.J.S.A. 30:4C-15.1(a). Accordingly, we address only defendants' arguments regarding prongs three and four and C.J.'s additional arguments.

III.

Pursuant to the third prong of N.J.S.A. 30:4C-15.1(a), the Division must demonstrate it has attempted alternatives to termination of parental rights in its proposed permanent placement of a child. N.J.S.A. 30:4C-15.1(a)(3). Pursuant to N.J.S.A. 30:4C-15.1(a)(3), "KLG is considered an alternative to termination of parental rights that offers permanency and stability to a child residing with a relative or kinship caregiver." N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 82-83 (App. Div. 2023).

12

"The decision of a resource parent to choose adoption over KLG must be an informed one," M.M., 459 N.J. Super. at 260, and must be "unconditional, unambiguous, and unqualified." Id. at 264. Once the caregiver is provided information regarding the benefits and burdens of a KLG, the caretaker's preference between the two alternatives "should matter." Id. at 263. Moreover, neither the Division nor the trial court may force a resource parent or relative to become a KLG. See D.C.A., 256 N.J. at 24 n.8 ("When a court orders KLG, the child is placed with a caregiver with whom the child has a kinship relationship and 'who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood'" (quoting N.J.S.A. 3B:12A-2)).

We are unpersuaded by A.T.'s contention that the court "relying on outdated laws, mistakenly" ordered KLG "so as to appease the resource parents." We are also unconvinced by A.T.'s argument that had the court "not deferred [its] authority to consider alternatives to termination to [the Division] and the resource parents, and seriously considered KLG," it would have ordered KLG.

We are satisfied the court appropriately considered KLG as an alternative to TPR and determined KLG was not a viable option. It found the Division reviewed the differences between adoption and KLG with B.Y. and

13

she "testified that she wants to adopt [Charlie], which if granted would result in [Charlie] continuing to live with [B.Y.] and his older siblings." B.Y. was "unwilling to be a KLG" because she did not want to "continually have to be involved in issues regarding visitation." The court also found "[m]any other relatives were explored for placement and were unwilling, unable, or ineligible to take custody of [Charlie]."

As a result, the court determined there were "no viable alternatives to TPR" and it was "significant that [B.Y.] already has had custody of [Charlie] for nearly two years, and also has custody of his older siblings." Having reviewed the record, we are convinced the court did not treat B.Y.'s preference as dispositive and properly determined that KLG was not a viable alternative to TPR.

C.J.'s claim that the court erroneously determined adoption was in Charlie's best interests because B.Y. "stopped therapy for Charlie shortly after he was removed" lacks merit. After Charlie's removal, the Division arranged for counseling services through a counseling service for children who are in crisis. Charlie participated in eight weeks of counseling, after which the therapist determined counseling was no longer necessary. In November 2024, B.Y. "decided [Charlie] needed to go back in therapy" after he started to exhibit behavioral issues. By January 2025, Charlie was again receiving in-

14

home counseling. C.J.'s claim that B.Y. terminated Charlie's therapy is not supported by the record.

IV.

Prong four requires the court to determine whether TPR "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong 'serves as a fail-safe against termination even where the remaining standards have been met.'" R.G., 217 N.J. at 559 (quoting E.P., 196 N.J. at 108). "The question is 'not whether a biological mother or father is a worthy parent, but whether a child's interest[s] will best be served by completely terminating the child's relationship with that parent.'" Ibid. (alteration in original) (quoting E.P., 196 N.J. at 108).

This analysis "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999). Instead, "[t]he question . . . is whether, after considering and balancing the two relationships, . . . child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [their] relationship with [the] foster parents." Ibid. Courts have "long considered a child's relationship with the resource family . . . when [it] applie[s] the fourth prong." D.C.A., 256 N.J. at 23.

15

Vital under prong four is consideration of "[a] child's need for permanency." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (citing K.H.O., 161 N.J. at 357-58). "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. Critically, children should not "languish indefinitely" in a resource placement while a parent attempts to correct parenting difficulties. N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

Based on our review of the record, we are convinced the court correctly applied prong four and determined TPR would not do more harm than good. For more than two years, Charlie has been thriving in a stable and loving home supported by his grandparents. In contrast, defendants have long struggled with substance abuse, domestic violence, and contact with the criminal justice system, and have not demonstrated they will be able to remedy these issues in the future. The court's finding that the Division proved prong four by clear and convincing evidence is amply supported by the record.

A.T.'s contention that Dr. Swanson agreed TPR would cause more harm than good is incorrect. To the contrary, Dr. Swanson testified Charlie's

A-3651-24

grandparents would be able to ameliorate any harm and TPR would not do more harm than good.

V.

We are not persuaded by C.J.'s claims, raised for the first time on appeal, that the law guardian failed to represent Charlie's interests by advocating for TPR and provided Charlie with ineffective assistance of counsel for several reasons.

First, C.J. lacks standing to assert these claims. The law guardian is statutorily empowered "to represent minors in alleged cases of child abuse or neglect and in termination of parental rights proceedings." N.J.S.A. 9:6–8.21. "The basic role of the law guardian is to serve as an advocate for the minor child." J.B. v. W.B., 215 N.J. 305, 332 n.4 (2013). The law guardian's obligation is to advocate for the child's position in the manner the law guardian finds to be in the child's best interests. See Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div. 2002) ("Law guardians are obliged . . . to make recommendations as to how a child client's desires may best be accomplished, [and] to express any concerns regarding the child's safety or well-being"), certif. denied, 174 N.J. 39 (2002).

The law guardian did not represent C.J. and could not have breached any professional duties or obligations owed to him. The law guardian represented

17

Charlie alone and any claims that the law guardian failed to represent Charlie's interests or provided him with ineffective assistance of counsel belong to Charlie. To the extent there were any alleged deficiencies in the law guardian's representation of Charlie, the appropriate mechanism to raise those concerns was through a timely application to the trial court for the appointment of a guardian ad litem (GAL).

Rule 5:8B provides, "[i]n all cases in which custody or parenting time/visitation is an issue, a [GAL] may be appointed . . . if the circumstances warrant such an appointment." The basic role of a GAL is to be "an independent factfinder who works to determine what action is in the ward's best interests and makes that recommendation to the court." Vill. Apartments of Cherry Hill, N.J. v. Novack, 383 N.J. Super. 574, 579 (App. Div. 2006). A GAL must "determine[] . . . what action is in the ward's best interests and advocate[] for that position" and "serve[] the court on the ward's behalf." Ibid.

Second, because C.J. failed to timely request the appointment of a GAL before or during trial, his arguments are waived. "Generally, an appellate court will not consider issues, even constitutional ones, which were not raised [with the trial court]." State v. Galicia, 210 N.J. 364, 383 (2012). "For sound jurisprudential reasons, with few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an

18

opportunity for such a presentation is available.'" State v. Witt, 223 N.J. 409, 419 (2015) (quoting State v. Robinson, 200 N.J. 1, 20 (2009)).  We do not "consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'"  Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)).

Finally, even if C.J. had standing to assert these claims and timely raised them, the claims lack merit.  There is no support for C.J.'s argument that the law guardian failed to represent Charlie's interests by advocating for TPR.  The law guardian is not obligated to blindly advocate for the wishes of a child.  As our Supreme Court held in E.P., 196 N.J. at 113:

> children's wishes may often not be in their own best interests. For example, children may want to return to their abusive or neglectful natural parents, who have endangered and continue to endanger their lives. In such cases, it may be not only futile, but contrary to a child's best interests to solicit his or her opinion.

Although Charlie told Dr. Swanson he "wanted to be with his mommy and daddy," she specifically noted Charlie was "not old enough or mature enough to make that kind of determination for what [was] truly in his best interest[s]."  We are satisfied the law guardian properly considered all the

19

evidence in the case in determining how best to represent Charlie's interests and did not fail to represent his interests by advocating for TPR. C.J.'s disagreement with the law guardian's decision to take a position adverse to him is not a basis to find the law guardian violated any obligations to Charlie as his attorney.

C.J.'s claim that the law guardian provided ineffective assistance of counsel to Charlie is similarly unconvincing. In New Jersey Division of Youth & Family Services v. B.R., 192 N.J. 301, 309 (2007), our Supreme Court adopted the two-part test set forth in Strickland for ineffective assistance of counsel claims in guardianship cases.[2] To establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that counsel's performance was objectively deficient. B.R., 192 N.J. at 307. To make that showing, defendant must show counsel's performance fell "outside the broad range of professionally acceptable performance." Ibid. Second, defendant must establish prejudice. Ibid. That is, "there must be 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.'" Ibid.

A defendant must establish, by a preponderance of the credible evidence, that he or she is entitled to the requested relief. State v. Nash, 212 N.J. 518,

---

[2] Strickland v. Washington, 466 U.S. 668, 687 (1984).

541 (2013) (citing State v. Preciose, 129 N.J. 451, 459 (1992)). To sustain that burden, the defendant must allege and articulate specific facts that "provide the court with an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992). Defendants must do more than make "bald assertions" of ineffective assistance. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).

C.J. first argues the law guardian "failed to diligently communicate with Charlie and learn what his wishes were." This is nothing more than a bald assertion of ineffective assistance. C.J. does not provide any support for such a claim. Moreover, as discussed previously, the law guardian was obligated to advocate for what the law guardian determined was in Charlie's best interests even if that was inconsistent with Charlie's expressed desire.

C.J.'s claim that the law guardian elicited "false testimony from [Dr. Trott] that [he] had no bond with [his] child . . . because the expert did not complete a bonding evaluation" lacks merit. Dr. Trott testified that C.J. refused to participate in the bonding evaluation after he questioned whether C.J. was under the influence of substances. It was not improper for the law guardian to elicit that testimony.

C.J.'s claims that the law guardian "manipulated" Dr. Trott by providing him with selective evidence and "inappropriately elicited testimony" from Dr.

21

Trott that he used "a Kinetic Family Drawing test" with C.J. are unavailing. The fact that C.J. disagrees with Dr. Trott's opinions and the basis for his opinions does not establish that the law guardian's performance was objectively unreasonable. To the extent Dr. Trott allegedly testified based on unreliable or incomplete data, he was subject to cross-examination and any weaknesses in his testimony could have been exposed at trial. C.J.'s arguments are based on nothing more than bald assertions and are insufficient to support an ineffective assistance of counsel claim.

VI.

C.J.'s claim that the court "considered prejudicial and inadmissible hearsay statements that fentanyl was found in [Charlie's] toys and . . . dynamite was found in [the] kitchen cupboard" is without merit.

At trial, the Division called Detective Bruce Sanderson of the NJSP to testify regarding the November 2023 search of defendants' residence and the contraband that was seized. Specifically, he testified they found "[f]entanyl, methamphetamine, various paraphernalia . . . [and] quart[er] or half sticks of dynamite" in the home. A.T. objected to the detective's testimony because it was "prejudicial to [A.T.] while the criminal matter is pending." Because C.J. did not object to the testimony, much less raise an objection based on hearsay, his claim that the court improperly considered any alleged hearsay statements

22

is waived.  See Galicia, 210 N.J. at 383 (stating arguments raised for the first time on appeal are deemed waived).

To the extent defendants objected to the testimony as "prejudicial," we review the court's decision to admit Detective Sanderson's testimony for an abuse of discretion.  State v. Brown, 170 N.J. 138, 147 (2001) ("When a trial court admits or excludes evidence, its determination is entitled to deference absent a showing of an abuse of discretion").  Of course, evidence is not inadmissible because it is merely "prejudicial."  Pursuant to N.J.R.E. 403, evidence may be excluded if "its probative value is substantially outweighed by the risk of . . . undue prejudice."  There is no basis for us to determine the court's decision to admit the detective's testimony regarding the contraband found in defendants' residence was a misuse of its discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M. C. Harley*

Clerk of the Appellate Division

A-3651-24